UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.    10-80149CR-KAM
Magistrate Judge Hopkins

UNITED STATES OF AMERICA,

-vs-

CHRISTOPHER GEORGE,
       Defendant.

_____/

## INITIAL MOTION TO QUASH SEARCH WARRANT AND SUPPRESS EVIDENCE [DEFENDANT'S RESIDENCE] AND RELATED CONVERSATIONS WITH AUTHORITY

COMES NOW the Defendant aforesaid by the undersigned counsel and makes this Motion to Quash the Search Warrant and Suppress Evidence seized from the Defendant's residence at 3485 Lago de Talavera, Wellington, Palm Beach, Florida that is firearms, photographs, computers, ammunition and all other evidence, including the later intercepted conversations regarding these weapons that the Government seeks to introduce as evidence and the Defendant would state as follows:

1.      The Defendant's Motion to Quash the Search Warrant and Suppress Evidence is predicated, in part, upon the improper issuance of several telecommunication interception orders [hereinafter sometimes for brevity "wiretap"] which assertedly provided the probable cause, in part, for the issuance of the instant search warrant by Magistrate Judge Linnea Johnson. The Defendant submits that the search warrant stems from the wiretap, at least, in part and hence is the "fruits of the poisonous tree". The Defendant is filing, also, a Motion to Suppress the several

wiretap intercepts that were allowed and will adopt the factual and legal aspect of the Motion as part of this Motion as if such were set forth in haec verba for purposes of argument.  The Defendant alleges in some large measure that the search warrant is the "fruits of the poisonous tree", that is the wiretap orders that issued, as well as also being singularly lacking in probable cause for the search warrant to issue.  The exhibits for this Motion and the wiretap Motions, as a separate pleading to the Court indicates, will be provided by the parties in a manner that protects privacy and other considerations as a Superseding Indictment has not been returned.

2.     Thus, while the factual recitations in the affidavit and application for the search warrant at issue in this Motion set out numerous facts, Mr. George submits these recitations do not establish a sufficient basis for the issuance of a search warrant for any evidence of "criminality" as suggested would be found in the Defendant's residence. Further, the attachment that sets forth what is sought is obviously overbroad for what could be sought at the Defendant's home and vested all discretion with the agents as opposed to a limitation by warrant that is constitutionally required to prevent a general search.

3.     The affidavit and application for the search warrant fails to set forth probable cause for the issuance for that warrant.  Some pertinent information contained therein is "stale" and thus not able to support a finding of probable cause, and other information is not factually supportable at all.

4.     A great deal of the information contained in the affidavit and application for search warrant is merely conclusions based upon unsupported factual allegations crafted by experienced agents to cause a warrant to issue.

5.     The affidavit contains not only numerous errors and indeed

misrepresentations of fact but also fails to contain, for the Magistrate's considerations, numerous material facts that ought have been provided. The omissions, and misrepresentation as will be illustrated, are of such a degree as to compel a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d. 667 (1978).

6.     The evidence sought to be employed in the "felon in possession" case, the only matter now pending, was seized by virtue of that certain search warrant signed on February 24, 2010 by Magistrate Judge Linnea Johnson. That warrant called or allowed for the search for numerous items alleged to be within the Defendant's home [attachment B to the application for search warrant], although there is an issue as to what location was actually sought to be searched by the affiant. There was no reference to any firearms as far as the undersigned can see in either the affidavit or warrant.

7.     The warrant presently under review was issued upon the application and affidavit of Drug Enforcement Agent Alfred Cortes. The warrant sets out a laundry list of non-contraband items to be seized and again the supposed basis for such seizure is contained in the affidavit and application.

8.     The affidavit as well as the warrant fail to comport to the requirements of the Fourth Amendment to the Constitution of the United States. The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effect against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

9.      There was, it is submitted, no probable cause for the search of the Defendant's personal residence, 3485 Lago de Talavera, Wellington, Florida.  There was similarly, as fully detailed in the separate Motion to Quash Evidence Seized from Unlawful Electronic Interceptions, no cause for the "wiretap orders" that were issued and then employed, to allow the interception of the conversations that, in part, provide a basis for the issuance of the search warrant under attack.

10.     The lack of probable cause for the issuance of a search warrant, and the omission of crucial material facts in the affidavit as well as the negligence in the assertions of other facts contained therein as more particularly set out below, establish that the warrant at issue must be quashed, and all evidence seized should be ordered suppressed.

11.     The Defendant would also urge the Court to suppress the later intercepted statements the Defendant made regarding the guns that were seized. These statements, which involved the Defendant, his wife and others, stem from and were captured on the March 2, 2010 wiretap.  First, these conversations are the fruits of the poisonous tree of the illegal initial wiretap of November of 2009 and the invalid search warrant.  They also are the product of wiretap order based upon, inter alia, the obvious deception of the issuing Judge William P. Dimitrouleas.  Paragraph ninety four (94) of that affidavit for the intercept warrant advised Judge Dimitrouleas under oath that "The use of search warrants at this time is premature ... Even if probable cause were to be established at this time would alert the target subjects of the existence of the investigation and would prevent the law enforcement agents from identifying other co-conspirators, other locations or seizing contraband and would likely cause the targets of this investigation to flee the jurisdiction in order to avoid prosecution and to hide their asserts".

In fact the search warrants, including the one under review, were obtained a week earlier, on February 24, 2010 and were being held by the agents for later execution.

The reason for that last wiretap, it is submitted, was that the agents were seeking to overhear the Defendant [as well as others] react to the execution of numerous search warrants at several homes and businesses on or about March 2 or 3, 2010.  Indeed forfeiture complaints were also filed by the United States on March 3, 2010, which amplifies the presentation of improprieties and omissions the Defendant alleges.  A *Franks* hearing should clearly be held for this obvious and unmistakable deception, and all statements regarding the guns be ordered suppressed. Since the Indictment has not yet been superseded the undersigned cannot address the other multiple search warrants that ought be reviewed and render the evidence suppressed.

12.     The Defendant would urge that the Court find, after a full review of the instant Motion as well as the Motions addressing the wiretaps, that the issues raised by the Defendant compel a full *Franks* hearing, and that thereafter the Court enter an order suppressing all evidence seized by the search warrant presently addressed.

13.     The Defendant submits that assertion by the affiant in the instant application for the search warrant [itself probably for American Pain, see interliniation on page 1 of the affidavit] that the items sought to be seized have been used for drug trafficking and money laundering and related activities have no actual basis in fact nor is probable cause for that established and that in fact the Defendant submits no warrant should be issued.

14.     The Defendant will address facts presented to the Magistrate in the affidavit for search warrant to demonstrate that the issuance of the warrant was error.

## A.  BASIS OF INVESTIGATION

The Defendant would initially present the following analysis of the proof suggested by the Government for the search warrant to again illustrate the failures of the affidavit that resulted in the warrant:

15.    Paragraph 4: While numerous physicians practice pain management in South Florida, there is nothing in this paragraph that remotely suggests that any law is being violated, and indeed Florida law permitted the pain clinics to exist and operate.  Federal law did not address the subject to the degree that it could regulate a state business, save for the prescription distribution requirements of the CFR and CSA.  The DEA did, on January 18, 2005, publish certain comments in the Federal Register regarding 21 CFR part 1306, Controlled Substances for Treatment of Pain.

16.    Paragraph 5: Tragically, numerous overdose deaths related to oxycodone exist, however they are a fraction of the alcohol related deaths or nicotine related deaths that occur in this State and elsewhere but, again no illegality is shown by the presentation as to the Defendant or particularly his home.

17.    Paragraph 6: The fact that Florida did not have a monitoring system for prescriptions does not allow the conclusion to follow that any illegality occurred and none did vis a vis the doctors [see testimony of Jennifer Turner, quoted below]. Taking this paragraph to its logical conclusion, one would have to assume the Florida Governor's [Rick Scott] knowledge of the Florida "Pill Mill" problem as well the law would render the Governor liable for criminal sanctions or his residence available to search, as he and the Attorney General of Florida are well acquainted with the issues as the "pill mill" bill he/they vetoed that addressed that exact issue.  Hence, one could logically argue complicity in what the affiant sets forth.

18.    Paragraph 7: While there are various factually correct matters contained

in document, the affiant was well aware that the Defendant, the clinics, and physicians discharged or refused to see thousands of patients for improprieties including positive urines, doctor shopping, corrupt MRI examinations and a myriad of other matters that, it is submitted, should have been included in the affidavit so that the Magistrate had complete presentation of the facts.  Indeed, an undercover agent or agents themselves were rejected for improper attempts to obtain prescriptions contrary to what is asserted or were otherwise cautioned about the use or transfer of pills. Indeed, in undercover conversations with Ethan Baumhoff, the manager of the clinics, the agents were advised that not only did the clinic discharge doctor shoppers they actually reported persons so doing to law enforcement [UC meeting of June 23, 2009].  The doctors also did inventories to prevent any diversion, and the clinic reported violations to law enforcement, the manager advised.

Similarly the agents, contrary to what is asserted, were aware that the Defendant and "his" clinics did in fact accept credit cards and checks, a material matter that ought have been presented in the affidavit considering the assertions of the agent otherwise.

19.    Paragraph 8: This, again, is an incorrect representation.  The Defendant submits there are no "applicable laws" as to what a physician must conform with to prescribe drugs or to treat a patient other than sound medical practice and the good faith treatment by the physician. The Defendant submits the doctors are the ones who are trained to practice medicine, and it is they who so do, not the Drug Enforcement Administration agents.  DEA "notices" actually advise "it is not the DEA's role to issue medical guidelines specifying patient characteristics that warrant the selection of a particular opiate or regiment for treatment of pain" [see also 21 U.S.C. §871 et

seq.] and the Florida Board of Medicine regulations in the "consultation section" that set out standards the doctors should follow.

20.     The case agent, Jennifer Turner, was made a witness during the Defendant's bond hearing and with this, the following was adduced:

    Q.     All right.  These pain clinics were licensed by the state, correct?

    A.     Yes.

    Q.     Okay.  And pain clinics are licensed and legally able to operate within the State of Florida, correct?

    A.     Yes, they are.

    Q.     Okay.  And the pain clinic, American Pain, or the pain clinics associated with Mr. George all had M.D.'s proscribing the medications, correct?

    A.     Yes, they did.

    Q.     And as opposed to doctors, osteopathic doctors or D.O.'s or anything like that, every single doctor was a medical doctor from an American medical school, correct?

    A.     I don't know if they were all from an American medical schools.  I don't want to testify to that.

    Q.     Okay.  They were all M.D.'s?

    A.     Yes, they were.

    Q.     Okay. Some of them, many of whom had 20 and 30 years of experience in medicine, correct?

A.      I don't know that for a fact.

Q.      Okay. And these were the persons that were proscribing drugs, correct?

A.      Yes.

Q.      And Mr. Schwartz talked about 180 to 240 pills per month per patient, correct?

A.      For Oxycotton, 30 milligram tables, yes.

Q.      Right. And that is the standard recommended course of procedure for proscribing Oxycodones, isn't it? 6 per day?

A.      There is no standard.

Q.      Well, let me ask you this: Have you ever taken them?

A.      No, sir, I have not.

Q.      Have you seen the prescription bottles you get? Take one every four hours for pain as needed?

A.      Yes, I have.

Q.      Okay.  So one every four hours, that's 6 per day times 30 days is 180 pills, correct?

A.      Yes.

Q.      The standard operating procedure for pills, correct?

A.      I am not a medical professional and I cannot testify to what the medical industry consider acceptable.

Q.      Well, you are testifying that something was done illegally.   You don't even know what the recommended dosage is?

A.      I know what the standard is in South Florida amongst pain clinics in South Florida.

Q.      And that's the standard?

A.      Typically for Oxycotton, 30 milligrams; anywhere from 180 to 240 individual pills for 30 milligrams.

Q.      And that's exactly what was done that you are talking about here, correct? Five licensed medical doctors through a licensed pain clinic?

A.      Yes.

Q.      Now, tell me what law under any amendment to the Constitution permitting travel says that people cannot travel to Florida to get medicine?

A.      There isn't one.

Q.      Okay.  So people can travel from anywhere, correct?

A.      Yes, they can.

Q.      All right.   And how many people in your investigation travel to Europe because of their differences in the way they manage pain?  Are you aware of that?

A.      I am not aware of any.

Q.      Okay.  So we know that there is a pain clinic.  We know they are licensed.  We know that doctors are

> passing out the pills, but you guys are going to try to
> make a RICO out of it, correct?

A.     Yes.

And, further at page 18 of the initial wiretap application the affiant acknowledged in this investigation:

> Rather than focusing on the medical decisions of the
> doctors who work at these clinics, which is an aspect of
> this case that would ultimately come down to expect
> medical opinions regarding the efficiency of the
> examinations and prescription decisions made by those
> individual physicians on a case by case basis it is out belief
> that the proper focus should be on clinic owners and
> operators who have set up pill disposing operations, all for
> the purpose of evading law enforcement and enriching
> themselves and other with millions of dollars in cash.

## B.  BACKGROUND OF INVESTIGATION

This "section" of the warrant application need also be analyzed for its accuracy to determine the warrant's "validity" and a reply to each pertinent paragraph is set out.  Since it would require the Defendant to rewrite every paragraph to do this, an incredible amount of time and paper would be expended, so the Defendant is responding to each paragraph in a way the reader can juxtapose the affidavit paragraph with the analysis and response thereto.

21.     Paragraph 10: The Defendant in fact owns the pain clinics; the Defendant owns the LLC shares, the others depicted are registered agents or managers, a common practice in the corporate or business world.  Moreover, due to the intercepted conversations the affiant had to know that this statement was presented to the Magistrate was either false or recklessly indifferent to the truth as the Defendant never hid his ownership of the clinics and in fact, as the tapes or

interviews indicate, he spoke with the Department of Health as the owner.  According to Baumhoff he also met with the DEA as the owner when they inspected the premises [undercover meeting of October 2, 2009]. He was captured on tape talking with real estate agents to lease new space, investment advisors from Fidelity Mutual and others discussing the clinics and making known he owned pain clinics and was doing business as such.  Further the Government, it is submitted, through the IRS, as well as the wiretap was aware the Defendant in fact paid approximately 1.9 million in estimated income taxes on an anticipated seven million plus dollar income in 2009.  Certainly the statements regarding his "draws" confirm this.

These allegations provide no basis for probable cause to search the Defendant's home; indeed to be extreme and somewhat fatuous, but exemplative, as Baumhoff told the agents Walt Disney used "straw owners" to buy half of Osceola County [undercover meeting with Baumhoff July 9, 2009].  The fact that the Defendant had others listed on the paperwork is of no particular moment, these were united liability corporations.  The Defendant was open and notorious about his ownership as the judicially sanctioned wire intercepts confirm.

22.    Paragraph 11: This paragraph completely contradicts the assertions of paragraph 10, and is an issue to determine whether probable cause may be found to search the Defendant's home.

23.    Paragraph 12: These paragraphs, it is submitted, illustrate as the Defendant suggested, that everything is "out in the open", contrary to what is otherwise asserted as an attempt to obtain search and wiretap warrants, and in fact Baumhoff told the agents that SunBiz listed him as the manager of the business.

24.    Paragraph 13: These paragraphs also illustrate that everything is out in the  "open", as opposed to what is traditionally found in criminal organizations.

25.    Paragraph 14: The conclusions of this paragraph advise nothing other than five [5] full time fully licensed DEA approved medical doctors were working at a pain clinic and were, obviously, prescribing pills through validly issued prescriptions.  The prescribing of these pills, according to case agent Turner, during testimony at the Defendant's detention hearing, were within medical standards [see transcript of Pretrial Detention hearing, pages 18-20].  Interestingly, these statistics from the DEA office of Diversion Control that are referenced regarding the five doctors fail to or do not suggest the diversion of even one pill by the Defendant's clinics or his doctors, who, as Baumoff advised conducted inventories of the drugs received and possessed.

26.    Paragraph 15: This paragraph describes of a review of American Pain's financial records.  Since search warrants had not yet issued it is obvious that American Pain records as well as the Defendant's records and other financial records had all been subpoenaed from banks or IRS or other obtained by Federal investigators. Baumoff, in a number of undercover meetings, stated how the business operated, that cash was deposited each day and how Mr. George operated, that is complying with the banking and tax laws.  This paragraph establishes that in 2009 American Pain paid the doctors, in obvious compliance with the tax law as it was easily adduced some 5.3 million dollars in income.  Since obviously these millions were deposited, this is not evidence of money laundering or illegal conduct; indeed, it is just the opposite, particularly when the amount of money the Defendant received, which is outlined below, is considered and even more so considering what the Government through Assistant United States Attorney Beckerleg set out in the complaint for forfeiture that was filed the day after the warrants were executed on the Defendant's homes.  In that pleading the amount deposited was claimed to be in

excess of 14 million dollars, which was never mentioned in the affidavit for search warrant. This, however, confirms the Defendant's assertions in this Motion that there was material relevant information withheld from the Magistrate that militated against the issuance thereof.

27.     Paragraph 16: This paragraph, it is suggested, raises issues of serious omissions from the affidavit. While Stacey Mason did indeed die of a drug overdose, what the affiant failed to advise the Magistrate Judge is that Mr. Mason, just before his death, was depressed and had advised others he was going to commit suicide over some "love" problems. In fact, Mason had other drugs in his system which was also not disclosed, including oxymorphone, hydrocodone and marijuana that were not prescribed by American Pain doctors [see Exhibit A that will be furnished and to quote from the report included in Exhibit A "Stacey said we would not see him anymore", compare: DEA hearing held on July 8, 2010 1033-1038]. Again, this death in January 2009 has no relevance to the Defendant's home and ought not have factored therein, and this is more fully described in the Motion to Quash the Wiretap filed on even date herewith.

28.     Paragraph 17: This paragraph suffers similar infirmities as paragraph 16. While Mr. Bates died from an apparent "overdose", the affiant ought have advised the Magistrate that in direct contravention of the prescription warnings, and indeed common knowledge, Mr. Bates took an excessive amount of medication and was also drinking alcohol, with his friends in a hotel room in Plantation. It should be noted that the clinic, in direct response to the request from the medical examiner in Broward County provided the records requested immediately upon such request as any licensed business would do, another incident that should have been advised to the Magistrate.

29.     Paragraph 18: This paragraph purports to detail information the agents

were provided by a doctor that worked at another pain clinic of the Defendant's some two years before the warrant issued.  Compounding the utter staleness of that information from 2008, the Defendant submits is the egregious withholding of information from the Magistrate Judge bearing upon the credibility of this "informant".

The physician, a Doctor Sollie, did indeed work for the Defendant.  He left the Defendant's employ, attempted to and in fact did write letters to solicit the Defendant's patients [who he now apparently claims were addicts], opened his own clinic within a month of leaving, bearing about the same name as the Defendant's clinic [South Florida Pain became, with Dr. Sollie, South Florida Pain Center].  Thus Sollie was in fact <u>sued</u> by the Defendant for violating a non-compete clause [see *South Florida Pain, LLC, a Florida Limited Liability Company. v. Eddie Sollie, an individual, and Eddie Sollie, M.D., LLC, d/b/a "South Florida Pain Center", a Florida Limited Liability Company*, Broward Circuit Court Case Number: 08-64249(03)].  The obvious motive for this doctor to suggest illegality on the part of the Defendant for his own financial benefit and to escape the non-compete clause lawsuit should have been made known to the Magistrate Judge since this is one of the "key" paragraphs of the several warrants that issued.  The credibility of the information provided by this doctor should have been assessed by a "neutral magistrate", not a warrant seeking agent.

The failure to advise the Magistrate on this ground alone compels a *Franks* hearing.

30.    Paragraph 19: [Details information over a year old] This paragraph provides nothing that is directed to probable cause for a search warrant for anything related to Christopher George, let alone for his residence.

31.     Paragraphs 20 and 21: This paragraphs involves CS1, a former DEA agent that has a criminal past, it is believed, stemming from his DEA employment, who worked as a private investigator and the Government attempt to set forth a factual basis for purported money laundering that was in fact attempted by this CS1 at Government urging.  However, as the paragraph concludes "After the undercover meeting was arranged, George declined to have further direct contact with CSI".  This paragraph as written is obvious, the Defendant declined to launder money.  However, the affiant neglected or, it is submitted, deliberately omitted crucial facts.  Mr. George in fact discussed that he was "making his money legally", and further advised of various factors that negate the conclusion that he ever wished to launder money.  This information mandatorily ought have been presented the Magistrate no matter when or how broached not one time did Christopher George ever agree to launder money in any way suggested by the agents or their operatives.

In every interception, in every conversation the Defendant made clear that he made his money legally and was paying taxes thereon.  He sought investments [ie a conversation with Fidelity Investments, not an offshore bank] and heard his father's advice to protect his money, not from not paying taxes or reporting but from suits or asset protection, which he did not follow.  The Defendant, contrary to what is asserted, did have further contact with CS1.  In fact, a recorded conversation occurred on May 26, 2009 that illustrates that the CS, in his private investigator capacity, was working for the Defendant, obtaining statements from employees and doctors regarding how the clinic was being conducted.  In fact the Defendant was going to have his lawyer call the CS to talk to him about what was to be done as far as interviews.

The information in this paragraph moreover dates from August 29, 2008 and is far beyond stale aside from the other infirmities described.

Paragraph 21:  In reality, in this conversation, again ten months previous to the issuance of the warrant, and as opposed to the suggestions of the affiant, the confidential source was told by Baumhoff, the manager of the pain clinic, that <u>he, Baumoff, wanted to launder or hide his money</u> as he was trying to keep money from his "wife"; Baumhoff was in litigation over child support.

Later, Baumhoff told to the confidential source and an undercover that no one knew how much money the Defendant had but Baumhoff stated "I know it's a couple million" [about the exact amount the presearch warrant wiretaps captured Mr. George stating he wished to invest at the time he was speaking to Fidelity Investments], something that without question should have been presented to the Magistrate. Further this was all Baumhoff's opinions, even when he, without basis opined, it was 40 million.  No conversation is with the Defendant and the Defendant already refused any contact regarding money laundering.  The Defendant also submits nowhere is it stated that 40 million needed to be laundered, or indeed that Baumhoff even had access to the Defendant's money.   The analysis of this conversation can be characterized, charitably, as misleading and inaccurate which a reading of the transcript establishes [albeit a draft, it, as many of the others, except those, with Mr. George, are quite accurate].  All transcripts will be attached under separate cover as exhibits for the Court along with the CDs, as the Notice of the Parties advise.

32.    Paragraphs 22 and 23: [Regarding matters 10 months prior to the issuance of the warrant] These paragraphs of an undercover meeting on March 28, 2009 defeat any suggestion of money laundering or impropriety even as skeweredly drafted by the agent.  Again, the agent is misleading the Magistrate: "UCI and

Baumhoff met and discussed money laundering methods", this is true, but it is for <u>Baumhoff</u> to launder his own money due to this ex-wife or mother of his child taking half of his salary, a crucial pertinent and material fact which is omitted by the agent. This is a crucial fact bearing on the truthfulness of the assertions being put before the Magistrate Judge in an effort to obtain a warrant, and the actual lack of probable cause for the search of the Defendant's residence.

Baumhoff mentioned George but George apparently wanted nothing to do with any illegality or anything else despite Baumhoff's urging but the conversations do continue on about Baumhoff's financial problems.

<u>Crucially</u> on this tape and, again, specifically not presented to the Magistrate is the conversation in the "saloon" related to the "50,000" in Baumhoff's backpack:

> U.C.:  That money you got in the bag now, what are you, you making a bank deposit?
>
> E.B. [Baumhoff]: Tomorrow morning.
>
> U.C:  In the
>
> E.B.  Company account.
>
> U.C.  In the companies account.
>
> E.B.  The whole thing.
>
> U.C.  So.
>
> E.B.  His philosophy.
>
> U.C.  He's paying taxes on it then.
>
> E.B.  That's his philosophy.

U.C.   He's making a paper trail.

E.B.   Yea.

[See transcript which will be included in all exhibits by separate cover].

The Court will hear numerous times that this was indeed Christopher George's philosophy.  Mr. George, for the year 2009 paid 1.9 million dollars in estimated taxes on an estimated seven (7) or eight (8) million dollars declared income, which will, by analysis later be shown to be what is accurate and, when juxtaposed with the analysis of bank records described in the forfeiture complaint confirms that most if not all monies were deposited.

The tape concludes with the UC trying his best to induce Baumhoff to get the Defendant to talk or meet with him, which of course never occurs and thus provides no probable cause for a warrant. Then, on another undercover conversation the Magistrate was not advised about, this on June 23, 2009, which the Defendant submits would have been of critical importance for a Magistrate Judge, Baumhoff had the following conversation with the undercover agent:

UC:   What have you got, you got the daily receipts again.

EB:   Yeah, everyday, its ridiculous.

UC:   What do you gotta go right to the bank?

EB:   No I just. I go no where to help it, wont trust any [unintelligible].

UC:    What do you do with the daily, that's your, what you don't take you take it to the bank right?

EB:    I take it home and then tomorrow I take it to the bank.

UC:    Oh okay.

EB:    I mean I don't drop it in the night deposit.

UC:    You don't do a night drop.

EB:    They'd shit bricks if they got that much money in the night deposit. (pause) Yeah and trust me it's not enough for me ta.

UC:    Your all cash business, we talked about this before, you take it to the bank, the banks doing CTR's or their doing SAR's.

EB:    CTR's everyday.

UC:    Everyday?

EB:    My name.

UC:    In your name?

EB:    Um-hmm.

UC:    That's not good.

EB:   I'm a W-2 employee, I'm just a manager, I don't own the place.

UC:   You told me before that your on paper as owning it.

EB:   Straw owner.

UC:   But on paper you're the owner.

EB:   Ah no, on SunBiz.org I'm listed as the general manager.

UC:   Oh okay.

EB:   I'm not the owner.

UC:   Alright but your doing the deposits.

EB:   And Chris draws the K-1 and gets all the fucking profits, which is, well he's paying it all to taxes too, but.

UC:   Well yeah it's a cash business, strictly a cash business right?

EB:   And I, yeah, well he takes credit cards too, but, I um, I had a talk with the accountant.  I'm like dud, he's on the hook here for a whole lot of taxes, he goes trust me we've got it all covered and I said no I don't think you realize, he goes on Ethan I don't think you realize what he claimed in taxes.  I said okay, I know what I put in the bank, I don't know what he claims in taxes......

33.     Corroborating the undisclosed conversations with Baumhoff, and illustrating not only once again the need for a *Franks* hearing, but also the singular lack of support for probable cause when considered with the above, is paragraph twenty three (23) which should be and is quoted:

> Your affiant is aware that Currently Transaction Reports (CTR's) filed by Bank of America reveal that Baumhoff deposited $146,500 cash on March 20, 2009, into an account in the name of American Pain LLC.

34.     Couple this with the next paragraph of the warrant that Baumhoff stated he filed CTR's <u>everyday</u> in his name and any claim of money laundering or cash impropriety that could lead to a warrant for Christopher George's home is defeated. In paragraph 26 the UC and Baumhoff estimate about $300,000 per week is generated by American Pain which is "fifteen [15] mil per year", and simple addition illustrates it all is banked.  Again, the complaint for forfeiture authored by Assistant United States Attorney Beckerleg avers:

> Financial documents relating to George, South Florida Pain, American Pain and others show that during 2009... the three banks used by Mr. George or his companies, led the Government to determine "that those three banks combined filed 147 CTRs reporting a total of $14,094,979 in cash deposits" [Forfeiture Complaint, Case Number: 10-80340CV-Marra, paragraph 28].

The doctors made some five million.  Elsewhere in the wiretap affidavits, it is established Chris George drew about 7 million in checks [his estimated personal income] and that totals 12 million.  Considering the operation of the clinics, the rent, numerous employees, the purchase of the pills that are disbursed by these licensed doctors and 15 million is right on target and all monies are accounted for, thus further

evidencing the misleading presentations in the affidavit.  Moreover, and perhaps more troubling, in illustrating these misleading statements or misrepresentations is the fact that the information within the forfeiture complaints filed the day the search warrants were served make it obvious that any wiretaps were unnecessary and that the continued utilization of traditional methods would have produced the end result.

35.     Paragraph 28: This paragraph is the Government's purported "smoking gun" regarding the clinic due to the Defendant being held out by Doctor Beau Boshers to be the "expert" as to the propriety of dispensing oxycodone to an undercover agent that makes questionable statements regarding alcohol consumption on the tape to attempt to chronicle wrongdoing.  Interestingly the transcript of the tape nor the undersigned's listening thereof does not contain aspects of the conversation that alleges the Defendant to be an "resident expert" as quoted by the agents. This will be addressed in the accompanying wiretap Motion, but this conversation even taking the agent's conclusions as a basis of fact does nothing to provide probable cause for the search of the <u>Defendant's residence,</u> the issue presently being addressed, rather it should be, and in fact was, as shown below, directed to the medical office, the intended point of execution.  The Defendant would also submit any owner of a pain clinic would know that one does not mix alcohol and prescription drugs. The Defendant never stated he was sending the person to another clinic that would prescribe oxycodone.  <u>The Defendant advised he was not a doctor and if the doctor does not feel comfortable</u> prescribing medication, there was nothing he [George] could do about it. Interestingly as clear as this is on the CD, it appears to be omitted on a Government transcript.   The Defendant states that he did not tell Pavnick to take care of the patient, and asked about the wait time. The Defendant will offer the CD to the Court for review.  The Defendant will also request that the

Government produce the entire recordings, as what occurred in conversations thereafter among the agents [at least as set out in the transcripts] has a bearing on how the investigation was being conducted and the attitude of the agents conducting it.

36.     Paragraph 29:  The fact that money was stolen from the Defendant's home in October 2008 some sixteen months before the warrant was sought, as asserted in paragraph 29, which was reported to the police, illustrates nothing more, it is submitted, than does paragraph 31(a) that is that the receipts from a day or two work were taken to a home to be taken to the bank, as all the conversations with Baumhoff indicated.  Further, one can hardly assume a criminal calls the police to report theft of illegally obtained property.  Considering the sophistication the Government attributes to Mr. George, it can be nothing less than reporting a true crime, theft of personal property.

Paragraph 31(a).    The Defendant submits that the conclusion of the agent regarding the intercepted conversation of Baumoff has no factual support for the premise that money is at the Defendant's house.

Paragraph 31(b) refutes, it is submitted, the prior assertions of the affiant regarding any concealment of ownership or assets.

37.     Paragraph 32:  All of paragraph 32 concerning bank and wire transfers as much as a year earlier and its subsections provide no probable cause for a search warrant or the objects thereof and in fact this paragraph contradicts the assertions of the affiant, by depicting legitimate bank transactions and obviously no intent to hide or conceal any transactions, which perforce preclude a finding of probable cause. Christopher George was transferring money to his accounts, and purchases were being made not by cash but in the traditional method and manner.

38.     Paragraphs 34 through 41: These paragraphs detail undercover

operations with doctors at the clinic.  The clinic is licensed by the State, the doctors are all licensed by the State and have DEA numbers and hence, the undercover police operation certainly provides <u>no</u> probable cause for the <u>search of the Defendant's home</u>, or for that matter the clinics.  The taking of these facts as if some impropriety were occurring in the "medical world" cannot provide a basis for the search of a home or clinic, and indeed the last paragraph before the memorandum exemplifies this point.  In fact, while not necessary at this juncture, the Defendant would submit that under §64B8-9.013 Standard for the Use of Controlled Substances for the Treatment of Pain, issued by the Florida Board of Medicine as regulations, the actions of the doctors conformed therewith as Turner's testimony and paragraphs 18 from the affidavit agree.  In fact in paragraph 34, UC3 received 120 pills, a one month supply for four pills a day, a normal dosage as Turner advised.  As it relates to the undercover's visit on October 23, 2009, as set out in paragraph 37 the doctor declined to increase dosage, and lectured UC2 after he refused to raise the undercover's medications and further advised that UC2 could not sell the medications, could not give to friends and that they had to be taken as prescribed or otherwise he could not be a patient.

Paragraph 41, regarding the extensive surveillance that law enforcement was able to enjoy lends nothing toward probable cause for the Defendant's home, but certainly illustrates traditional techniques were available instead of a wiretap.

39.    Paragraph 43(a)-(e): Paragraph 43(a)-(e) details conversations the Defendant and others had about what are then placed in the context of the entire conversations about monies received from the clinics before being deposited and where the money was located.  Nothing in these conversations or surveillance of Dianna Pavnick reveal a single instance of illegality or otherwise provide any

probable cause for the search of the Defendant's residence, and thus paragraph 44, the conclusion of the affiant, is without any factual basis.  To be sure the agent's [affiant's] statement that the facts show "that American Pain generates and maintains records of patient visits and prescriptions as well as other business records generated over the course of routine business operations", provides irrefutable  evidence the warrant was being sought for the clinics, as set out in the second paragraph of the affidavit, then crossed out, as opposed to the Defendant's residence.  Interestingly on March 2, in seeking the wiretap, the affiant states paragraph 99]:

> Financial information concerning American Pain Clinic and Executive Pain has been procured and shows that the amount of cash deposited into the corporate accounts is limited to the amount of funds needed to operate the clinics.  This practice is confirmed through some of the interceptions over the TARGET TELEPHONE.  However, the whereabouts of the additional cash that the investigation has determined exists is still unknown.  Agents have learned through the interception of the TARGET TELEPHONE that STEWART has a safe at his home and is storing some cash.  However, additional locations have not yet been determined.

This quite clearly refutes the assertions a week earlier for probable cause for the search of the Defendant's home that the money is being kept at the Defendant's home.

That, it is obvious, the affiant had no knowledge or cause to believe that cash was within the Defendant's residence, yet a search warrant was issued a week earlier.

Lastly, and most importantly, to further show the lack of probable cause existing for the Defendant's home the sworn affidavit for the search warrant, at paragraph 45 recites, in pertinent part, "Based on the facts enumerated above your

Affiant believes that there is probable cause to search the subject premises located at 1200 N. Dixie Highway, Lake Worth, Florida", which is not the address where this warrant was executed or for which the warrant based upon these assertions was issued.

## MEMORANDUM OF LAW

The Defendant would begin by expressing the obvious, that is before a search warrant may issue there must be probable cause to believe an offense has been committed and that the fruits, thereof are located in the place for which the warrant is sought.  See *Zurcher v. The Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970 (1978). There the Supreme Court held:

> The terms of the Fourth Amendment, applicable to the States by virtue of the Fourteenth Amendment, are familiar:
>
> > The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

While dealing with obviously different issues, the Court recognized that "[u]nder existing law, valid warrants may be issued to search *any* property ... at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found".  No such probable cause is established in the affidavit at bench to allow for a warrant to search the Defendant's home, if his home were even the subject of the affidavit.

While the affidavit must be "tested and interpreted... in a common sense and realistic fashion", *United States v. Vantresca*, 380 U.S. 102, 108, 85 S.Ct. 741 (1965), inferences may be made only from the facts contained in the affidavit. *Whitley v. Warden of Wyoming Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031 (1971). In this case the affidavit and applications for the Defendant's residence simply did not contain facts which demonstrated probable cause that there was a criminal violation of law by the Defendant in that residence or that his residence was connected thereto in the manner required to allow the issuance of a warrant. The Defendant concedes, solely for purpose of argument, and not as acknowledgment, that a lengthy investigation with various undercover personnel and wiretaps and so forth was conducted, however there was no setting forth of the factual underpinnings necessary to establish probable cause for the search of the residence at 3485 Lago de Talavera, a "penciled in" location.

"[A]ll data necessary to show probable cause for the issuance of search warrant must be contained within the four corners of a written affidavit under oath". *United States v. Holzman*, 871 F.2d 1496, 1510 (1st Cir. 1989) (quoting *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971)). The Eleventh Circuit Court of Appeals stated in *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002), quoting from *United States v. Horne*, 848 F.2d 137, 140 (9th Cir. 1988), "[I]t is critical to a showing of probable cause that the affidavit state facts sufficiently to justify a conclusion that evidence or contraband will probably be found <u>at the premises to be searched</u>" [emphasis supplied]. The *Martin* Court continued, "Specifically the affidavit should establish a connection between the Defendant, the residence to be searched and a link between <u>the residence and any criminal activity</u>", citations of the Court omitted, emphasis supplied. The Court also noted that the information in the affidavit "must

also be <u>fresh</u>", again emphasis supplied, and the Defendant would direct the reader to the case cited by the Eleventh Circuit, *United States v. Zimmerman*, 277 F.3d 426 (3rd Cir. 2002).

And, as the Court held in *United States v. Domme*, 753 F.2d 950 (11th Cir. 1985) on this issue of "stale" information, "[a]s with other types of search warrants, probable cause needed to obtain a wiretap [or ipso fact a search warrant] must exist at time surveillance [the search] is authorized".  A search warrant that is based upon stale information of previous misconduct is insufficient "because it fails to create probable cause that similar or other improper conduct is continuing to occur". *United States Bascaro*, 742 F.2d 1335 (11th Cir. 1984), citing to *United States v. Weinrich*, 586 F.2d 481 (5th Cir. 1978).

As the Court instructed in *United States v. Deering*, 296 Fed.Appx. 894, 2008 WL 4636491 (11th Cir. 2008).  "[T]o show probable cause, the Government's application for a search warrant must be timely, that is it 'must reveal facts that make it likely that the items being sought are in that place when the warrant issues'".

Again, while it is the Defendant's position the affidavit was drafted for a place other than the Defendant's residence, and nothing in fact addresses that residence that could rise to the level of probable cause, still the bulk of the relevant conversations are clearly stale.

The Defendant recognizes the Courts have held ongoing criminal activity can defeat a staleness claim [compare *United States v. Magluta*, 198 F.3d 1265 (11th Cir. 1999)], and the Government may be able to raise that argument to the search warrants for the clinics when and if the time comes, but presently that has no play as to the warrant for the Defendant's home which is what is under review.

The Defendant submits that the entirety of the information, at least for the search of the residence, was stale.

The Defendant also submits, considering that in reality the warrant was authored for the Defendant's place of business so too, the attachment that described what was to be the scope of the search was overly broad as to constitute a forbidden general search [see ie, *United States v. Travers*, 233 F.3d 1327 (11th Cir. 2000)].  As the Court noted:

> The requirement that warrants particularly describe the place to be searched and the things to be seized makes general searches under them impossible [citing to *Stanford v. Texas*, 379 U.S. 481 at 512 (1965)]. A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad. Id. The resulting general search is unconstitutional. In order to deter such warrants and searches, the Court has held that any evidence so seized must be excluded from the trial of the defendant. *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

The Defendant would continue with his argument.

Under *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2328 (1983), the "totality of the circumstances" test is to be applied to determine whether probable cause exists to believe that incriminating evidence is located <u>in a particular place at the time a warrant is issued</u>.  However, that search warrant must be supported by probable cause, *United States v. Travers*, 233 F.3d 1327 (11th Cir. 2000), and while in determining whether a search warrant is based on probable cause, the issuing magistrate may make a common sense decision of whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in that place, *Gates, supra*; see also *United States*

*v. Anton*, 546 F.3d 1355 (11th Cir. 2008), still the constitutional requirement of probable cause must be met.  That somewhat fluid standard cannot be satisfied in this instance and the warrant should be quashed.

The Defendant also submits he is entitled to a *Franks* hearing on the issues raised with regard to requisite necessity.

The Defendant specifically requests a *Franks* hearing with regard to the willful and/or reckless omissions of material fact replete in the Government's averments of requisite necessity in the Alfred Cortes affidavit.   Mr. George has delineated numerous factual matters justifying such a hearing including but not limited to the affidavit's failure to disclose all of the facts that actually occurred, the misrepresentation of facts it asserts and the other failings set out herein above.

Under *Franks, supra,* 438 U.S. 154 at 171-172 (1978), a Defendant must meet certain requirements to obtain a hearing.  The Supreme Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the

alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue. [Footnotes omitted].

In this case, the Defendant George has clearly and unequivocally met his burden. The omissions referred to above are clearly set forth. Also clearly set forth are the misstatements contained in the affidavit.

Defendant George contends that at a minimum the statements in Agent Cortes' affidavit were recklessly made and material omissions as are set forth herein above occurred. The issue of the misrepresentation to Judge Dimitrouleas is apparent on its face. It can also be argued that the decision not to include numerous favorable or complete aspects of the matter was willful. Certainly an agent such as Cortes who claims to have training and experience, should have known the impact additional available information would have had on the requisite cause for a warrant to issue; it would not have issued.

A detailed offer of proof is made in this case by virtue of the Government's own submission of the requisite compliance with Standing Discovery Order that was provided. This submission of the tapes, transcripts and other matters as set out, in part, I this Motion. As well as the forfeiture complaint by Mr. Beckerleg, the civil lawsuit involving the Defendant and Dr. Sollie during the relevant time periods, the failure to include crucial aspects of the recorded conversations with George's claim of legality, the obvious misleading of the Court as to what was deposited [also very pertinent to the wiretaps] as set out in the Baumoff tape compels the granting of a

hearing.  An evidentiary hearing under *Franks* will further document these matters as it can be fully detailed by the Defendant.

The only thing being challenged is the veracity of the information provided or not provided by affiant.  No challenge is asserted with regard to the statements of the cooperating sources.  However, for the record Defendant George does dispute that completely truthful information concerning himself was provided by the sources.  He denies their allegations in large part as will be also set out in the Motion to Quash the Wiretap.

Finally, as has been argued heretofore, these misstatements and omissions clearly impacted on the determinations of requisite necessity and probable cause.  Thus, having met the test set out in *Franks*, *supra* an evidentiary hearing is warranted.  See *United States v. Perdono*, 800 F.2d 916 (9th Cir. 1986); *United States v. DiCesare*, 765 F.2d 890 (9th Cir. 1985).

Where, as here, when a Defendant makes a substantial preliminary showing a Court must hold a hearing to determine if the false deliberate or reckless statements made in the affidavit were material to the Court's finding of probable cause or necessity.  *United States v. Fowlie*, 24 F.3d 1059 (9th Cir. 1994); *United States v. Ipolito*, 774 F.2d 1482 (9th Cir. 1985).

In this case, Defendant has demonstrated that the omission by the affiant of numerous material facts was intended to and did in fact mislead the Court which issued the search warrant.  *United States v. Motz*, 936 F.2d 1021 (9th Cir. 1991).  The Court if it is persuaded that the allegations are correct is then required to take palliative steps including recasting the affidavit for a de novo determination of probable cause and requisite necessity.  *Ippolito*, *supra*.  This is the process mandated in this case.

Finally, the Defendant would submit that no claim of "good faith exception" under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984) could ever be validly asserted considering the multiple instances of wrongdoing and impropriety that is presented, compare *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) for any reasonably trained agent would have known that the warrant was illegal despite the Magistrate's authorization under the totality of circumstances herein.

Suppression is mandated.

WHEREFORE the Defendant would request that this Motion be granted.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of March, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record listed in the Service List below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## SERVICE LIST

Lawrence D. LaVecchio, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33301

Paul Schwartz, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33301

FRED HADDAD, P.A.
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394
Tel:   [954] 467-6767
Fax:   [954] 467-3599
By:____*/Fred Haddad_____
        FRED HADDAD
        Florida Bar No. 180891
        Email: Dee@FredHaddadLaw.com