UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.    10-80149CR-KAM
Magistrate Judge Hopkins

UNITED STATES OF AMERICA,

-vs-

CHRISTOPHER GEORGE,
        Defendant.
_____/

## INITIAL MOTION TO SUPPRESS WIRETAP EVIDENCE AND INCORPORATED MEMORANDUM OF LAW

COMES NOW the Defendant aforesaid by the undersigned counsel and files his Initial Motion to Suppress all Wiretap Evidence derived from three intercept orders, the first signed on November 6, 2009 by Judge James I. Cohn, the second on December 28, 2009 and the third on March 2, 2010 both of which were signed by Judge William P. Dimitrouleas and states as follows:

## WIRETAP ORDERS CHALLENGED

1. November 6, 2009, target telephone 561-722-506. Defendant George was a named target subject as well as the subscriber to the telephone and has standing to challenge the interception order.

2. December 28, 2009 application, affidavit and order for same phone.  Defendant George was a named target subject and has standing to challenge the

continuation interception order.

3. March 2, 2010 application, affidavit and order for same phone. Defendant George was a named target subject and has standing to challenge the continuation interception order.

## FACTS UPON WHICH MOTION IS BASED
## WIRETAP 1, NOVEMBER 6, 2009

1.     In or about November 2009, the United States through then Assistant United States Attorney David Haimes after having made application through the Justice Department and Attorney General Holder, caused to be filed an Application for an Order Authorizing the Interception of Wire Communications [hereinafter sometimes for brevity "wiretap"]. Three wiretaps were obtained for the Defendant's cellular telephone, the initial and two continuations of the initial order which were sought and obtained.

2.     Accompanying each application was an affidavit of DEA Special Michael Burt.

3.     The initial affidavit set forth facts attempting to establish probable cause that a crime was being committed, that Defendant was committing that crime and that he was utilizing the target telephone; some 10 other targets of the investigation also were named in the application.

The initial application also, at page 5, advised that:

> (c) normal investigative procedures have been tried and
> have failed, reasonably appear unlikely to succeed if tried,
> or are too dangerous to employ as further described herein.

This assertion is rejected by the Defendant and will be addressed in detail below.

The application also advised the issuing Judge of the use of confidential informants and their function, [page 7,8] which will be also addressed within this Motion.

4.     The application names a target telephone.  The number for the target telephone was 561-772-7506 mobile equipment identifier 359201013751269 subscribed by the Defendant Christopher George.

5.     The initial affidavit by the agent assertedly made a showing of necessity for the interception, since orders were signed.  This, it will be established, was error as the Defendant will challenge the wiretap on several grounds, to wit:

> 1.   There was no necessity for a wiretap, normal investigative techniques were in fact successful.
>
> 2.   There was numerous erroneous misleading or false assertions with the affidavit that compel a *Franks* hearing on the matters raised.
>
> 3.  The agents failed to properly minimize conversations in accordance with the law.

6.     The initial affidavit acknowledged that three confidential sources were in place, that a doctor that had worked for the Defendant was cooperating and that at least four undercover operatives were "inside" the pain clinic interacting with the doctors, while "wired" and video recording their visits.  Others within the clinic elsewhere were also assisting the investigators.  It is also advised that physical surveillance was on-going, trap and trace and pen registers were employed and that witnesses were had, including one Pedro Martinez who was a former employee of American Pain who provided a great deal of information and items of evidence had been seized.  Several of the arrested pain clinic patients from out of state were also

cooperating and detailing information regarding the clinic and its operations. The affiant also set forth additional facts that the Defendant submits indicated a high success rate in the investigation to date of the application to the degree, it is submitted, arrests could have then been made. However, the affiant still insisted that there was a need for electronic surveillance, which there was not.

7.      Next the agent detailed what he believed the investigation still lacked and what the purpose of the wiretap was. A synopsis of the state of the investigation as disclosed in the affidavit will be set forth hereinbelow as well an analysis of the normal investigative techniques.

8.      Thus, the Defendant George moves for the suppression of all evidence obtained as a result of wiretaps pursuant to 18 U.S.C. § 2515, 2518 (2005).

9.      The Defendant would, as he did with the Motion to Quash Search Warrant and Suppress Evidence address certain of the factual issues presented in the affidavit and denominated "specific events" and will suggest that the presentations compel, inter alia, that a *Franks* hearing be had, and thereafter that an order be entered quashing the three wiretap warrants.

The Defendant, of course, cannot set out the entire content of each paragraph contested, and hence will "caption" each so that the rebuttal, as it were, can be noted.

In paragraph 16, under the "Current Investigator and Criminal Use of Target Telephone" the agent states, inter alia, as follows:

> The targets are generally more sophisticated than traditional, street level narcotics distributors, and the businesses they have established to dispense these controlled substances to addicts from around the Southeast United States have a facade that includes legitimate-looking store fronts, examining "physicians," certain procedures they follow to appear to comply with the

laws (including some medical "requirements" such as an MRI), and sophisticated techniques to conceal the vast quantities of cash generated by these businesses. The doctors who work at these clinics have been doing this long enough, and have been sufficiently trained in asking the bare minimum of questions of the patients, that it is difficult to establish clear cut violations of the law by them. Without an insider or other means to obtain information regarding the inner circle...it is extremely difficult to investigate and prosecute these types of cases.

In fact the agents had numerous "insiders" in this "organization", a state licensed pain clinic, including confidential sources, undercover agents as well as having the ability to perform DEA compliances and accountability examinations at the business, audits of any other nature allowed by State and Federal law and other means in actuality not fully explored or utilized before resorting to a wiretap.

Then while asserting they could not state that the doctors are engaging in illegality, they argue they should be allowed to wiretap Mr. George as he makes money from the clinics he owns. That provides no basis for a wiretap and is not supportive of probable cause at all.

That paragraph does not suggest a telephone is used at all in the business.

## SPECIFIC EVENTS

10.    Paragraph 17 on page 19, is a purported money laundering conversation on August 29, 2008 between CS1 and the Defendant Christopher George, that occurred <u>some eighteen months prior</u> to the application is not only stale, <u>it completely fails to include for the reviewing Judge statements that Christopher George made</u> regarding the legality of his business, and also fails to advise the authorizing Judge, as the investigation established, George rejected numerous suggestions that he needed to launder money to "make it legal", for as George retorted, his money was legally

made.

The Defendant never, as is asserted, became hesitant about meeting any unknown individuals regarding money laundering, he just absolutely refused to engage in money laundering or meet anyone who suggested such.

The source of information, CS1, not only met with George, he was a private detective in his employ. CS1 is a former DEA agent who was imprisoned apparently for criminal activity as an agent who raised all kinds of scenarios to attempt to engage the Defendant in money laundering conversations. George utterly refused. In an attempt to obtain a warrant, despite the Defendant's refusal to engage with the CI in such money laundering conversations with the agent, the affiant, without any support or basis, suggests that publicity that was the basis for the refusal. There is nothing to support that save the agents overwhelming desire for a wiretap at any cost. The Defendant certainly did not hesitate to speak to investment advisors from Fidelity to invest monies.

In that same `, the affiant suggests the Defendant was concerned about DEA monitoring, when in fact, as was known to the agents, the Defendant called the DEA about his business and the way it was to be conducted, talking in fact to one Barbara Jeffries of the DEA. And, as quoted, in the Motion to Quash Search Warrant, Baumoff the clinic manager acknowledged the DEA could inspect whenever they wished, and when they did, in fact, inspect, Mr. George met with inspectors, at both South Florida Pain and American Pain.

And the suggestion that the Defendant did not take CSI's phone calls or have further contact is also untrue; the Defendant or his business continued to use him as a private investigator and George had conversations with him, he just declined to participate in any illegalities the CS offered. The Defendant, as detailed in the

Motion to Suppress Search Warrant, had CS1 conducting interviews of all employees many months after this meeting. The information for that matter was more than stale for issuance of a wiretap.

11.     Paragraph 18, the assault of CS2, which occurred in October of 2008, more than a year before the application for wiretap is, again, stale and isolated information vis a vis the intent of the warrant. This is a year old non-charged "state court" offense if the CS2 is to be believed. In fact CS2 is a childhood friend of the Defendant who was armed when he went to Jeff George's home after the purported theft, which of course is not included in the warrant, [see testimony of Jennifer Turner at the pretrial detention hearing]. The purported assault was obviously relayed to the police; the CS2 was not only not again "bothered" he tried to "set up" the Defendant to obtain drugs, which was another failure not included in the affidavit. The Defendant believes there is a tape of this that has not yet been provided. Interestingly, only one bullet hole was found, not two, as suggested by the witness when he stated <u>Jeff George shot by his head</u>. Again, the information in this paragraph has no bearing or necessity for a wiretap order to issue, it was a "closed" matter, and cannot provide probable cause for a wiretap.

12.     Paragraph 20. The affiant details a drug sale, allegedly, by a person named Giuffre who was arrested and advised the police he obtained the pills he sold from Derrick Nolan, who is an alleged employee of the Defendant. None of this activity implicates the Defendant Christopher George, or his business or home and certainly this "street crime" cannot be the basis for a wiretap to issue some ten months after the crime occurred. There must be some greater connection between the alleged criminal activity and the subject of a wiretap than was shown in this aspect of the affidavit.

13.     Paragraph 21 This paragraph details the purported seizure of MRI results from Jeff George, the Defendant's brother, in January 2009, which, again, is ten months before the wiretap orders.  This information has no bearing on the applicability in a wiretap application. Further, as the agents well knew Christopher George and Jeff George were not even talking to each other and in fact were engaged in lawsuit against each other [see Jeff George v. Christopher George and South Florida Pain, Case Number: 08-25715(13), Broward County Circuit Court].  Jeff George actually had an unrelated pain clinic of his own.  Once again, crucial information that was not provided the Court would have been a factor for the Judge to determine whether the application should have been granted.

14.     Paragraph 23-25 This paragraph sets out information from a former physician from American Pain.  This physician/witness, Dr. Sollie, was in fact a doctor at the clinic South Florida Pain [the predecessor to American Pain], who decided to solicit Mr. George's clients [that Sollie now claims are addicts] and then open his own clinic through a planned venture to begin the next month, which of course is not included in the affidavit.  Further, the affiant, at the least, should have advised the Judge that Dr. Sollie was sued by Mr. George for various reasons including that Sollie gave letters to all the patients and attempted to solicit all the patients for his own financial benefit to a clinic he named South Florida Pain Center.  The law suit is referred to particularly as *South Florida Pain, LLC, a Florida Limited Liability Company. v. Eddie Sollie, an individual, and Eddie Sollie, M.D., LLC, d/b/a "South Florida Pain Center", a Florida Limited Liability Company*, Broward Circuit Court Case Number: 08-64249(03).  The District Judge ought to have been advised, the Defendant he asserts, that he contacted the DEA [specifically Allison King] regarding Dr. Sollie and advised that Sollie had been caught issuing illegal

prescriptions, among other things.  These matters ought have been presented to the District Judge so that the Judge could make an assessment of the <u>reliability</u> of the information it was receiving from someone personally embroiled with the Defendant. Failure to so do, it is urged, requires a hearing on the issue.  Of course, this information by Dr. Sollie is also from 2008.

15.     Paragraphs 26-29. This paragraph details the confidential source [CS1] introduction of an undercover money launderer to Ethan Baumhoff, the manager of American Pain. This was of course an attempt to get Baumhoff to introduce Christopher George to meet the operatives regarding laundering money.  <u>Baumhoff</u> met with these people, not the Defendant, but the most important factor, which again militates against the wiretap is the simple fact Christopher George "did not want to speak with UC1 about laundering his money".  The truth is George did not engage in any conversation that could allow the conclusion he was interested in laundering money.

The affiant's supposition about why the Defendant chose this action should not enter at all into the equation, as it is <u>facts</u> that determine whether the wiretap should issue.  The Defendant throughout this investigation no matter when he was presented ideas or conversations that sounded in money laundering declined to so do, and even when his father advanced offshore accounts as asset protection the Defendant spoke of adhering to the tax and reporting laws as his businesses were legal.

16.     Paragraph 31. June 31 meeting UC1 and Baumhoff.  This paragraph again illustrates that contrary to other assertions elsewhere by the agents, Baumhoff told the UC1 that CTRs <u>were filed</u> every day in his name, negating and refuting what is sworn to as the basis for cause, for the funds were deposited in the banks and were traceable therefrom, a simple investigative technique. The Defendant set out in great

detail in the Motion to Suppress the Search Warrant conversations Mr. Baumhoff had with undercover agents over several months.  In these conversations Baumoff details his deposits, Mr. George's leaving a "paper trail", the first of Mr. George paying taxes and a host of leads that were the basis for "normal investigative techniques" that had they been used would have been more than fruitful.

The Defendant submits the analysis of the monies from bank records or reviews that is contained in the affidavit illustrates that nothing improper is occurring.

Perhaps nothing is more exemplative of the misleading and false information presented than the complaint for forfeiture filed by the Government on March 3, 2010, where the Government acknowledges that over $14,000,000.00 was deposited in the bank in the year 2009. This corroborates Baumhoff's claims the clinic made $300,000 per week in which, considering all facts, is about 15 million dollars, less bad weeks about what is alleged in the complaint.

17.    Paragraph 32.  The July 9, 2009 meeting between UC1 and Baumhoff. This paragraph, in its body, illustrate that Baumhoff and "the people at American Pain try to stop the 'doctor shoppers'" and if they found out people were so doing they were discharged from the clinic.  Baumoff also stated in the conversation that the clinic alerted law enforcement to what illegalities may have occurred which was not advised. Undercover conversations that defeat the very essence of what the Government seeks to promote as cause should result in a hearing on the entire warrant.

18.    When one considers what the agent set forth beginning on page 31, regarding American Pain payments to doctors and the cash deposits, it should be noted that what the affiant stated is consistent with the statements to UC1 and the debriefing of Sollie.  If this be the case, which it is, no wiretap was necessary;

traditional investigative techniques have proven no wrongdoing has occurred. A wiretap cannot validly issue to attempt to change facts already known.

19.     The October 1 [October 2] meeting between UC1 and <u>Baumhoff</u> set out in paragraph 32 is yet another basis to suppress the wiretap or to order a *Franks* hearing.

The "synopsis" of this meeting provided no basis for any type of probable cause for a warrant, as again it sets out no criminality but just the opposite, particularly concerning the action doctors were taking vis a vis the patients in conformance with medical procedures, as well as taxes being paid on the monies. Further, included in this conversation <u>but not the affidavit</u> were the fact that the doctors were doing <u>inventories of all drugs</u>, and that Baumhoff advised Christopher George talked to the Department of Health <u>as the owner of the clinic</u>, [another fact that contradicts the "concealment" aspect] which was not advised or set out in the affidavit George also met with the DEA as clinic owner, Baumhoff advised. This of course raises the issue of the failure to have the DEA do accountability inspections and the host of other regulatory actions they could undertake. Other <u>omitted</u> matters that would be a matter of serious consideration are the conversations wherein Baumhoff had advised the agents the Defendant "<u>went to a powerhouse healthcare attorney and had them write up policies and procedures and I mean he did it right</u>..." [emphasis added]. Inclusion of this conversation would certainly give any reviewing Judge reason to pause and take a more scrutinized look at the entire warrant. Other conversations on this tape that were obviously deliberately omitted certainly militated against any finding of money laundering by Mr. George including Baumhoff discussing the W-2 employment status and related matters to the tax aspects.

Moreover, it should be included here that Baumhoff is a former law

enforcement person that was in the center of the Defendant's business.  He was captured on audio tape seeking to commit crimes of his own with his money and violate Court orders in his domestic cases.  He was the perfect informant the agents could have used.  The Defendant submits that had the agents confronted him with the tapes of his undercover conversations he would have folded like a house of cards, just as he did after the search warrants issued, and thus would have become the best use of traditional law enforcement techniques, that is the agents could have had him cooperate from within.

20.     Paragraph 34:  The Ohio Board of Pharmacy's email provides no basis for probable cause for a wiretap.  The email was sent regarding prescription in the "tri-city" area, and did no more than "remind pharmacists that for a prescription to be valid, it must be issued for a legitimate medical purpose...", which is of course what the requirement. The Defendant again reminds the Court of the statements of the affiant on page 18 regarding the issue of proper examination and prescription decisions that the affiant advised would not be the focus of this investigation, again a contradiction.

21.     The Oxycodone death of Stacey Mason is set out in paragraph 35 of this affidavit and see paragraph 16 of the affidavit for search warrant] warrants closer consideration again as to what was not provided the District Judge.

The Defendant has, in his Motion to Quash Search Warrant, detailed certain crucial factors omitted from the affidavit.  To repeat:

> 26.  Paragraph 16: This paragraph, it is suggested, raises issues of serious omissions from the affidavit. While Stacy Mason did indeed die of a drug overdose, what the affiant failed to advise the Magistrate Judge is that Mr. Mason, just before his death, was depressed and had advised others he was going to commit suicide over some "love"

problems.  In fact, Mason had other drugs in his system which was also not disclosed, including oxymorphone, hydrocodone and marijuana [see Exhibit A attached] that were not prescribed by the American Pain doctors.  Again, while this could be asserted for cause for a search of a clinic it has no relevance to the Defendant's home and ought not have factored therein.

Moreover, a review of the reports provided in discovery detail conversations Mr. Mason had with certain individuals and stated words that made it abundantly clear Mr. Mason intended to commit suicide [see ie, Shelby Durham's statement in Exhibit 1, where Tim King, her son in law, stated, Stacey was acting strange and he told Stacey's brother to watch him as he "told him he was going to kill himself... Stacey had tried to hurt himself before".  See also, Lisa Durham's statement where she advised Stacey had remarked "we wouldn't have to put up with him anymore".

22.    Pages 35 through 49 of the warrant [paragraphs 37-53 of the affidavit] detail visits of "CS3", "UC3" and "UC4" to American Pain Clinic.

These pages detail the entirety of the case that is, was, and could have been made against the Defendant, that is the doctors in the "conclusions" of the agents were failing to conform to medical standards with the assistance of the Defendant through his clinics and pharmacies.  Without ever conceding that issue, a reading of these fourteen pages illustrate beyond any doubt that from April 1, 2009 through at least August 26, 2009 [and that is only what is set out in the affidavit] the Government had three undercover operatives as patients of the clinic, obviously wearing wires and video recording equipment, interacting with not only named the doctors in their affidavit.  The targets of the investigation within the clinic, including, inter alia, Doctor Aruta, Doctor Boshers, Derrick Nolan, Christopher George, Doctor Beretsky, Doctor Quan, as well as Dianna Pavnik, Executive Pain employees, and

various patients in the waiting room whose names were learned [ie Woody Frost, Truman Frost and Joshua Cook, at page 46, 47 of initial wiretap application] were also in one way a or another "noted".  These out of state patients that were arrested or interviewed, according to the agents, detailed their illegal activities regarding the pills they were receiving, another obviously successful traditional law enforcement technique.

These paragraphs irrefutably establish that traditional investigative techniques were for the purposes of what these agents were seeking working and being successful beyond any degree imaginable in this type of investigation.  In fact, the Defendant's childhood friend was, as noted, CS2 that had continual contact with the Defendant.

Later argument will blend the other CS operatives and investigative techniques to allow the conclusion a wiretap was unwarranted even on this basis.

Moreover, the Court must consider whether the facts outlined in these paragraphs set out a basis for the District Judge to conclude a wiretap warrant was even necessary.  Exemplative is the recitation on paragraph 37 wherein a new patient [UC3] advised in the affidavit that the MRI he had brought would not be accepted and he was told he would have to go to an MRI center to obtain an MRI.  Clearly, the reason for the newly ordered MRI was to have a current "picture" for a doctor.  It can thereby be inferred the agents attempted to bring one of their own MRIs to establish lack of bona fides of the clinic or its doctors.  It failed.

The Defendant, as he did in the Motion to Quash the Search Warrant, takes issue with the Dr. Boshers' episode with UC4.

The Defendant is introduced as an "expert" to UC4 as Dr. Boshers is not willing to prescribe medicine to one who drinks.  The Defendant suggests any pain

clinic owner or manager should and would be well versed in the requirement of not drinking while taking medication as the Defendant advised the undercover what is conveniently left out of the conversation.  The Defendant submits this is a <u>material</u> matter and that the <u>Defendant advised the undercover that he was not a doctor and if the doctors did not feel comfortable</u> prescribing medication there was nothing he could do about it.

These paragraphs document the doctors were conducting examinations  and otherwise dealing with patients that purported to be in pain.  In fact paragraph 52 of the affidavit does not include the fact that Dr. Beretsky advised UC4 to tell his friend that taking pills are a <u>felony</u>, something which supports the assertions of good faith and the reasons for this statement and page 18 and the testimony of agent Turner.

22.    The Defendant would also take issue with the investigative conclusions set out by the affiant in paragraph 54.  The various cases cited by the affiant "based upon discussions with the United States Attorney's Office", all set out certain conduct and standards as to what would constitute wrongdoing by a doctor, particularly as described, the Defendant submits in the cases of *United States v. Rosen*, 582 F.2d 1032 (5th Cir. 1978) and *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006).

The *Hurwitz*, *supra* decision, considering the Amicus Briefs filed by the American Pain Foundation, National Pain Foundation and the Association of American Physician and Surgeons raises serious issues as to whether the doctors at the clinics at issue in this matter committed any wrong and  since the Government agents cited these cases it is assumed they read them also.  To again quote case agent Jennifer Turner:

> Q.    All right.  These pain clinics were licensed by the state, correct?

A.    Yes.

Q.    Okay.  And pain clinics are licensed and legally able to operate within the State of Florida, correct?

A.    Yes, they are.

Q.    Okay.  And the pain clinic, American Pain, or the pain clinics associated with Mr. George all had M.D.'s proscribing the medications, correct?

A.    Yes, they did.

Q.    And as opposed to doctors, osteopathic doctors or D.O.'s or anything like that, every single doctor was a medical doctor from an American medical school, correct?

A.    I don't know if they were all from an American medical schools.  I don't want to testify to that.

Q.    Okay.  They were all M.D.'s?

A.    Yes, they were.

Q.    Okay. Some of them, many of whom had 20 and 30 years of experience in medicine, correct?

A.    I don't know that for a fact.

Q.    Okay. And these were the persons that were proscribing drugs, correct?

A.    Yes.

Q.    And Mr. Schwartz talked about 180 to 240 pills per month per patient, correct?

A.      For Oxycotton, 30 milligram tables, yes.

Q.      Right.  And that is the standard recommended course of procedure for proscribing Oxycodones, isn't it? 6 per day?

A.      There is no standard.

Q.      Well, let me ask you this: Have you ever taken them?

A.      No, sir, I have not.

Q.      Have you seen the prescription bottles you get? Take one every four hours for pain as needed?

A.      Yes, I have.

Q.      Okay.  So one every four hours, that's 6 per day times 30 days is 180 pills, correct?

A.      Yes.

Q.      The standard operating procedure for pills, correct?

A.      I am not a medical professional and I cannot testify to what the medical industry consider acceptable.

Q.      Well, you are testifying that something was done illegally.   You don't even know what the recommended dosage is?

A.      I know what the standard is in South Florida amongst pain clinics in South Florida.

Q.      And that's the standard?

A.   Typically for Oxycotton, 30 milligrams; anywhere from 180 to 240 individual pills for 30 milligrams.

Q.   And that's exactly what was done that you are talking about here, correct? Five licensed medical doctors through a licensed pain clinic?

A.   Yes.

Q.   Now, tell me what law under any amendment to the Constitution permitting travel says that people cannot travel to Florida to get medicine?

A.   There isn't one.

Q.   Okay. So people can travel from anywhere, correct?

A.   Yes, they can.

Q.   All right.   And how many people in your investigation travel to Europe because of their differences in the way they manage pain?  Are you aware of that?

A.   I am not aware of any.

Q.   Okay.  So we know that there is a pain clinic.  We know they are licensed.  We know that doctors are passing out the pills, but you guys are going to try to make a RICO out of it, correct?

A.   Yes.

The Defendant would also note, again, that at page 18 of the initial wiretap application, the affiant wrote:

Rather than focusing on the medical decisions of the

doctors who work at these clinics, which is an aspect of this case that would ultimately come down to expert medical opinions regarding the efficacy of the examinations and prescriptions decisions made by these individual physicians on a case by case basis, it is our belief that the proper focus should be on the clinic owners and operators who have set up these pill dispensing operations, all for the purpose of evading law enforcement and enriching themselves and others with millions of dollars in cash. These clinics, who operate on a cash only basis receive money from each "patient" addict for office visits, from MRI prescriptions, and from the marked up price at which they sell hundreds of thousands of these pain medications to these addicts and other persons who the owners know, with certainty, will then turn around and illegally distribute at least a portion of their pills to others.

The agents were already aware from meeting with Baumhoff that credit cards were accepted and how the clinic operated, complete with doctor inventories and what has already been set out.

Thus, if this is the testimony of this agent, another agent cannot use "half of it" it for probable cause for a wiretap.

Moreover, the cases cited by the Government which appear, obviously, to be appeals for convictions, as opposed to wiretap applications depict serious misconduct that could never be asserted in the instant case. The factual circumstances set out in the *Rosen* [*United States v. Rosen*, 582 F.2d 1032 (5th Cir. 1978)] case, including the over prescribing of amphetamines, the statements the doctor made and the conduct he engaged in bear no resemblance to what is asserted against the Defendant or for that matter the doctors. The same is true of Doctor Hurwitz in his matter [*USA v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006)]. There, despite what the Government presented, as overwhelming evidence in its opinion, the matter was <u>reversed for a new</u>

trial on good faith, the Court finding  "Hurwitz did not dispute the bulk of the government's factual evidence, that is he did not argue that he did not prescribe the narcotics that were the basis for the charges against him.  Instead, Hurwitz argued that the manner in which he used narcotics to treat chronic and debilitating pain was a medically proper approach to a difficult medical issue", which the Defendant submits was conceded in the instant case by the conclusions set forth on page 18, cited several times.

23.    The same result really occurs with paragraph 56 "October 9, 2009 Arrest" of a former American Pain employee, who with the Defendant's estranged brother Jeff and others were selling drugs allegedly obtained from Jeff George.  In a footnote it is observed that this individual Pedro Martinez, did not find any contact between the drug dealer Pedro Martinez or his apparent supplier Christopher Haney and the "Target Telephone" [the Defendant], and while this information is included, another footnote advises "Your affiant is not relying upon any of the information provided by this cooperating individual for purposes of the present affidavit...", again illustrating the lack of probable cause for a wiretap of the Defendant's telephone.

The affiant sets forth, in the initial application [page 49] the investigative conclusions it suggests the issuing Judge should draw, citing to a series of cases that have, over the years, addressed the "bounds of professional practice" and what is the "proper prescribing" of controlled substances.

The affiant cites to *United States v. Rosen*, 582 F.2d 1032 at 1035 (5th Cir. 1978) and *United States v. Johnson*, 71 F.3d 539, 542-43 (6th Cir. 1995), two cases of doctor wrongdoing that is of such a nature as to have no applicability at bench. Indeed, the skewered presentations of the affiant in detailing the visits of UC1-UC4 with the doctors belies the fact that the doctors were complying with accepted

medical practice.  The affiant, a DEA police agent, apparently sets himself as the arbiter of acceptable medical practice as to what the doctors determine is necessary and how the practice is handled.  Yet one would think the Government would at least reference the Florida Board of Medicine regulations regarding the treatment of pain, particularly in light of page 18 referenced above.

However, before the wiretap ever issued, the affiant, in this section, has set forth what he, Agent Burt, believes to be investigative conclusions that proved that the clinics were unlawfully operating, that the doctors were merely in it for the money and to assist the clinic owner Christopher George.  Indeed, the affiant makes it clear, the Defendant would submit, that the four undercovers were able to gather and detail enough information for an arrest to have been made on the basis of the tapes, videos and actions of the doctors, the alleged "expert" Christopher George the "slightly incoherent Dianna Pavnik" as well as to the announcements of Derrick Nolan as set out on page  41 of the affidavit.  No wiretap was necessary.

The affidavit next traces the arrest of Pedro Martinez, a <u>former</u> employee of American Pain Clinic, who was <u>receiving</u> drugs from a <u>police</u> cooperator.

Martinez was then debriefed and gave "evidence" to the agents regarding his knowledge of the George brothers, Derrick Nolan and others.

And, the trap and trace analysis [page 56-58] established without ever needing to intercept a single call, the principals and persons involved, the "players", the interaction of the "players" and conspiratorial aspects of the relationship already suspected.

The affiant at page 58 of the affidavit begins the literary of the usual recited "Alternative Investigative Procedures Have Been Tried and Failed or Appeal Unlikely to Succeed, Tried or are Too Dangerous to Employ".

The affiant sets out the usual quoted reasons why traditional or normal investigative techniques have not worked and the rest of the soliloquy employed in every application the undersigned has ever seen.

The problem is that what is set out is not correct when what is set out there is juxtaposed to facts elsewhere. For example, the assertions at paragraph 65 regarding CS1 the Defendant's private investigator are so illogical as to be either incomprehensible or absurd.

And in paragraph 66, which states "individual from Kentucky and elsewhere who purchased pills from American Pain have been arrested and provided information about American Pain. Although their information corroborates other intelligence regarding the daily activities of American Pain, it does not pertain to the target subjects". All the agents had to do was "wire up" these cooperators and the target subjects would have been observed and engaged.

Again, this is traditional law enforcement at work, and when coupled with all other facts set forth establishes no wiretap was necessary, and it certainly places the target subjects within the sights of law enforcement, and coupled with what was learned conventionally before the affidavit ought have precluded its issuance.

Continuing, the assertions of paragraph 67 are likewise totally unsupported by any facts, and in fact were pure speculation considering in fact the agents had access to all of the Defendant's accounts as Baumhoff had already advised the CIs and UC1 that the clinics made $300,000 per week and that all money was deposited. In fact the agents knew that Baumhoff filed CTRs every day. Likewise, the surveillance assertions of paragraph 68 are likewise unavailing. In the first place, there was nothing other than pain clinics to surveille; this is not some "traditional" drug ring operating under "cover of night", this was a storefront pain clinic, advertised,

billboarded and otherwise <u>seeking</u> people.  The police could have put 100 undercovers in a day and the clinics would have examined them.  Further, the successful limited surveillance the affiant speaks of is the best surveillance that could be had and if continued would have been as fruitful as a wiretap. And, while the Government waited to install pole cameras that tactic, for whatever it be worth, could have easily been accomplished.

Similarly, the assertions of paragraph 71, regarding the use of a grand jury for investigation are the rote, usual recitations regarding grand jurys that is used in every wiretap case.  Unfortunately, for the United States, it is submitted, this is not the criminal drug conspiracy the boilerplate paragraph is generally directed to.  Here is a <u>state licensed</u> pain clinic. Every worker in the various clinics could have been granted immunity or been subpoenaed; all including the doctors were under the assumption they were operating lawfully.  Grand jury subpoenas could have been directed to everyone; the main operative, ie, Baumhoff, was already on numerous tapes discussing the entire operations of the clinics with undercover agents or confidential sources.  Again, this recitation of non-applicable matters militate against a wiretap warrant, for in analysis, traditional methods were available.

The affiant suggests in paragraph 72 that trash extractions are not viable.  The reality is they are not because what is being investigated is not a "narcotics" ring that the agents are generally familiar with.  Trash extractions either revealed nothing or nothing of a nature that could provide probable cause for a wiretap because there was nothing illegal to be found.

The recitations of paragraph 73 are questionable as to accuracy, but the agents were already aware from undercover interceptions and meetings that the Defendant was paying taxes, declaring his income and stating to all who would listen that his

clinics, salary and operations were lawful.

The monies could have all been traced, and the Defendant made no attempt to hide himself or anything other deceptive act that traditional investigative techniques could not have produced more.

## WIRETAP 2, DECEMBER 28, 2009

The affiant, again Agent Burt, after a month of wiretapping sought an extension of the initial wire. The Defendant, of course, begins with the obvious, the first wire was improperly issued, so the 28 December wire is but the "fruits of the poisonous tree", see *Wong Sun v. United States*, 37 U.S. 471, 83 S.Ct. 407 (1963), which compels that the second [and third] warrants be quashed. The application recites the usual tried and true boilerplate at paragraph 9(c), to wit: normal investigative procedures have been tried and have failed reasonably appears to be unlikely to succeed if tried, or are too dangerous to employ as further described herein.

Investigation and Significance of Interception at page 13 lists what the affiant believes the investigation has proven. The Defendant takes issue with the facts set out therein, again, particularly with the fact that any wiretap was ever necessary. The Defendant has a real issue with the "conclusion" that George may be looking to move money to foreign countries "including Belize". As the tapes show George's father broached that subject to protect assets, and the Defendant made clear he would not avoid declaring his money or paying taxes as the money was "legal", a fact not presented. Similarly, the Defendant was looking to invest five million with Fidelity, hardly some clandestine hidden fact that necessitated a wiretap. Surveillance and traditional techniques would have uncovered this aspect. Further, before any wiretap was sought, the Government obtained the Defendant's bank accounts and records and had several undercover tapes. The Government was well aware the Defendant had

paid about 1.8 or 1.9 million in estimated taxes for 2009 on a 7 or 8 million dollar income, which considering the detail of what he spent left him without question with five million to invest. These are monies that were made at what agent Turner admitted was a licensed clinic that had doctors that, according to the first warrant were not the focus.

The agent details numerous telephone calls that the agent suggests confirm the already acknowledged probable cause possessed before the initial warrant. Yet, once again, in tried and true fashion Agent Burt recites the normal refrain at page 48 and 49 regarding traditional investigative techniques which are blithely dismissed so that a wiretap might issue.

The agent continues at the next paragraph which the Defendant again submits is not supported by what occurred:

> 48. All normal avenues of investigation have been carefully evaluated for use or have been attempted with minimal results. The traditional investigative techniques utilized thus far have included the use of undercover officers, confidential sources, physical surveillance, use of grand jury, debriefing witnesses consensual tape recordings, obtaining toll records for the TARGET TELEPHONE, pen registers and trap and trace on the TARGET TELEPHONE, and trash pulls. Also closely considered, but not deemed likely to succeed for reasons set forth below, include the interview of subjects or associates and the execution of search warrants.

The agents had more than enough cause to arrest, search, indict and perhaps convict before the first wiretap, which the Defendant has already argued was improvidently granted. Certainly after what was presented in the application for the first wiretap, the Court ought have found that there was no necessity or basis therefor.

Further, while the agent decries the use of surveillance, his detail of what surveillance was done reveals that surveillance was extremely successful. In fact, Christopher George was surveilled going to the Fidelity offices, there was surveillances conducted everywhere. The search warrant details surveillance of Dianna Pavnick [George] and her possession of a banking bag. Surveillance established "counter" surveillance.

Moreover, this alleged counter surveillance is now one of the "darlings" of law enforcement's nursery for "offers of proof" of narcotics activity, to wit: "the subjects were conducting counter-surveillance" as indicative of criminal intent. This again goes to the non-necessity for a wiretap. Most incredibly after stating that surveillance could not work, the affidavit details surveillance between November 30, 2009 and December 4, 2009 that as with the prior warrant establishes that surveillance worked more than well, and when joined with other traditional methods would have achieved all the goals of the investigation [see page 52-54 of the affidavit].

The Defendant would submit that the conclusions regarding inspections of the business are totally unavailing, considering the Defendant was aware the day he opened a business he was subject to inspections by the DEA at any time. To suggest he would become wary is singularly unsupported by anything but the agents conclusory attempt to influence the wiretap process.

Most telling of the incredible contradictions and wholesale use of "anything that flies" to seek to avoid traditional investigation is the statement "Trash extractions have been of limited success at the residence of Christopher George and Pavnik. Law enforcement will continue to conduct trash extractions at the target's residences; however the use of trash extractions alone will not meet the goals of the investigation".

The reason the trash extractions were of limited success is there was nothing illegally happening or evidence to be found.

## WIRETAP 3, MARCH 2, 2010

The third wiretap affidavit, authored by Agent Burt sought a second extension of the initial wiretap. This document has several serious matters that need be addressed before the actual facts are addressed.

Illustrative of the boilerplate recitations of the necessities of which the Defendant complains is the wherefore clause of this wiretap [see page 66], which parrots the December 28, 2009 affidavit which parrots the initial wiretap application. In pertinent part it is stated:

> It is further requested that such interception not automatically terminate when the types of communications described above have first been obtained, but be permitted to continue until all communications which help to fully realize the authorized objectives, and which reveal the mode, manner, and method, in which the subjects, and others are yet unknown, plan the financing, shipment, and distribution of cocaine and other dangerous drugs by revealing (I) the nature, extent, and methods of the drug trafficking activities of the TARGET SUBJECTS; (ii) the nature, extent, and methods of operation; (iii) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the distribution and transfer of the contraband and money involved in those activities; (v) the existence and location of records; (vi) the location and source of resources used to finance their illegal activities; (viii) the location and disposition of the proceeds from these activities; and (viii) the location of items in furtherance of those activities, or for a period of 30 days, whichever is earlier. [Emphasis supplied].

Each wiretap states it was sought to obtain information about <u>cocaine distribution</u>, which is something that the Defendant has never had anything to do with, nor was one such fact even elicited about cocaine.

Also stated in that affidavit under oath by Mr. Burt:

> 94.  Although toll records and information from pen registers/trap and trace devices continue to be obtained and used; this alone would not achieve all of the goals of the investigation.  However, when used in conjunction with interceptions of conversations, these records have been useful in identifying those individuals being intercepted. 93. [sic]  <u>The use of search warrants at this time is still premature</u>.  The investigation has still not resulted in the identification of all of the precise location or locations where the organization maintains all of its records, or stores proceeds or other evidence of illegal activity.  Even if probable cause were to be established to search specific locations, utilization of this technique at this time would alert the TARGET SUBJECTS to the existence of the investigation and would prevent the law enforcement agents from identifying other co-conspirators, other locations or seizing contraband and would likely cause the targets of this investigation to flee the jurisdiction in order to avoid prosecution and to hide their assets.  Accordingly, the execution of search warrants is still premature. [Emphasis supplied]

This paragraph was, as argued before, a blatant misrepresentation of the facts. Search warrants [the undersigned still does not know how many] were obtained by the Federal agents a week earlier, after supposedly establishing probable cause before a Magistrate Judge in West Palm Beach, and, in fact, the warrants were executed the morning after this wiretap affidavit was presented and filed.  Forfeiture complaints were likewise filed that same date.

The undersigned has addressed this matter in this Motion to Quash Search Warrant and Suppress Evidence and has requested a *Franks* hearing on this issue of the obvious and deliberate misrepresentation and has also filed a Motion addressing the conversations derived from this wiretap.

The Defendant further submits that the above paragraphs are illustrative of the lengths to which law enforcement was willing to go to obtain non-needed wiretaps and to attempt to downplay the fact that all the probable cause necessary existed before the first wiretap was sought.

Within the application itself the same recitations of the inabilities of normal investigative techniques is set out. The affiant in this application, again, suggests that the Defendant "may be looking to move money to foreign countries, including Belize" [page 14], which has no support in fact or truth, as the Defendant never paid any attention to his father suggesting they talk about it. The Defendant, as the agents well knew, refused to meet with anyone, always asserting the legality of his business and the monies obtained.

The affiant notes in paragraphs 21-23 that conversations between the Defendant and his then attorney Henry Coxe regarding his Jacksonville case were intercepted and apparently overheard, as paragraph 23 states it clear that after the call the agents marked the call as privileged and flagged the number.

The affidavit details conversations about the clinics and the occurrences, many would have been discovery through normal investigative techniques.

Beginning at page 52, the affiant again presented the basis for his statement which for brevity, can be stated as "alternative investigative procedures are unavailable" and, as the Defendant has set forth repeatedly, the affiant proceeded to illustrate why that assertion is not correct. This was not a clandestine "drug

trafficking organization", as the affiant suggests on page 56, rather it was as open to traditional methods as any can be, as the bottom line is, as the Defendant George stated, innumerable times on the tape [which he did not know existed], his business was legal and he was complying with the laws.  Hence it was easily investigated, anyone could and did walk in.  While four undercovers are depicted, the amount that could have been used is endless.

The third wiretap is the fruits of the original illegality; moreover it suffers its own infirmities as particularly addressed, and it, for either and all of the grounds argued, must be suppressed.

## MINIMIZATION

Each of the warrants advises that "all monitoring . . . will be minimized in accordance with Chapter 119 of Title 18, United States Code", and that all steps would be taken to minimize the "interception of communications not otherwise criminal in nature", [see ie, pages 65 and 66 of the initial warrant, or page 63 of the third warrant].

The Defendant will, by separate document, provide a list of the calls not minimized, however the amount of non-minimized non-criminal calls in this matter is of great concern and ought be reviewed to determine what relief be granted.

The undersigned cannot recount how many conversations he has heard about female implants and of various kinds, model airplane racing, swamp buggies, half tracks, different sporting events and sometimes just inane conversations the Defendant and others had.

Innumerable personal conversations were recorded, and, at the least from the undersigned's listening, do not appear to have been in any way minimized.

The Defendant requests a hearing upon the failure to minimize these at least

50 calls.  As noted these will be identified by separate document.

## MEMORANDUM IN SUPPORT

Every application for electronic surveillance must contain a "full and complete statements as to whether or not other investigative techniques have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518 (1) ( c).  The purpose of the necessity requirement is to ensure "that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).  See also *United States v. Giordano*, 416 U.S. 505, 515 (1974) wherein the Court held:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications.

See also; *United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir. 2000); *United States v. Lilla*, 699 F.2d 99 (2nd Cir, 1983).

In order to determine whether wiretapping is both reasonable and necessary judgment is reposed in an independent judicial officer who reviews the application and affidavit. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997); *United States v. Ramirez-Encainacion*, 291 F.3d 1219 (10th Cir. 2002); *United States v. Spagnuolo*, 549 F.2d 705 (9th Cir. 1977).

An order authorizing electronic surveillance may issue only if the reviewing Judge determines, on the basis of <u>facts</u> submitted by the applicant that normal investigative procedures have been tried and failed or appear, if tried, reasonably

unlikely to succeed.  18 U.S.C. § 2518 (3) ( c), which realistically cannot be stated in this matter.

In order to determine if the strict requirement of 18 U.S.C. § 2518 has been met the Court reviewing the matter on a motion such as this is required to engage in a two part analysis.  Initially, the Court must determine whether the application in fact made a full and complete statement as required.  Should the Court determine that the applicant had substantially complied then the Court must continue to determine whether the issuing Judge abused its discretion in concluding that wiretapping was necessary in the particular case before it.  *United States v. Canales-Gomez*, 385 F.3d 1221, 1223 (9th Cir. 2003), *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002), *United States v. Blackmon, supra*.  A review of the necessity portions of the three applications before this Court show them deficient in both portions of the test.

While the facts and circumstances set forth in the affidavit may have led Agent Burt to the conclusion that wiretapping was necessary, his conclusion is not dispositive of that issue.  As indicated hereinabove, it is the judicial officer, not a DEA agent who makes the ultimate determination.  *United States v. Spagnuolo*, *supra*.

It is clear from a plain reading of the initial affidavit itself that there were facts known to the agent as set out, which if fully set forth to the District Judge might very well have tipped the balance wheel against electronic surveillance in this matter and indeed the investigation easily could have progressed without a wiretap based upon what is set forth therein that would have obviated the need for the several wiretaps.

It may be readily surmised that in order to enable the judicial officer to determine the requisite necessity of the interception, the affidavit must give the full and complete exposition of relevant facts contemplated by the statute.  In that vein,

the clear congressional intent was to make the requirements of requisite necessity absolute. *United States v. Salomme*, 978 F.Supp. 343 (D. Mass 1997).

> In contrast to the requirements concerning probable cause and prior applications...the government obligation to make a full and complete statement concerning the powerful but intrusive weapon that electronic surveillance constitutes is unqualified; the government is obligated to inform the court of all its information on this issue.

See also *Castillio-Garcia, supra.*

Therefore, as the First Circuit held in *United States v. Mastroianni*, 749 F.2d 900, 908 (1st Cir. 1984), the Government's duty of disclosure is not to be limited to facts upon which it seeks to rely, but all of the relevant information all agents in the investigation possess on the issue of necessity.

As addressed above, the judicial officer to whom the application is presented cannot make the assessment of whether a resort to wiretapping in truly necessary if the judge has before him only what the affiant has <u>chosen</u> to tell him about the investigation to date.   The necessity averments of Title III affidavits have a dreary similarity, and the one in this case is no exception.  In the opinion of affiants, physical surveillance is always inadequate, informants, if useful, can always go no further, undercover operatives can never be successfully inserted, and warrants, subpoenas and interviews are always inadvisable.  While some or all of these may be true in a given case, they are never all true in all cases.  Ultimately, the issuing judge needs all of the relevant facts so that he or she can make that judgment rather then a police officer or a prosecutor. *Canales-Gomez, supra, United States v. Torres*, 901 F2d 205, 232 (2nd Cir. 1990).

What is interesting in the instant matter is that the agent advises that he, the

affiant and the investigators <u>acknowledge</u>, despite what they otherwise wrote, that:

> Rather than focusing on the medical decisions of the doctors who work at these clinics, which is an aspect of this case that would ultimately come down to expect medical opinions regarding the efficiency of the examinations and prescription decisions made by those individual physicians on a case by case basis it is out belief that the proper focus should be on clinic owners and operators who have set up pill disposing operations, all for the purpose of evading law enforcement and enriching themselves and other with millions of dollars in cash. [Initial application at page 18].

Even more interesting is the statement of the affiant on page 19:

> The present investigation has involved numerous federal, state and local law enforcement agencies, including the FBI, DEA, IRS, Broward Sheriff's Office, Palm Beach Sheriff's Office and Kentucky law enforcement officers who have worked tirelessly on this investigation.   As set out in more detail below, this investigation has yielded probable cause to believe the TARGET SUBJECT are committing the TARGET OFFENSES utilizing the Target Business...

A determination of whether wiretapping is truly necessary in a given case must be more than a slavish devotion to tried and tested magic words appearing in multiple affidavits.  Based on the admissions in the preceding two paragraphs, Christopher George submits it was not all necessary.  There was more than enough evidence for arrests, search warrants and Indictment.  While these admissions were made still, in this case, the affidavit itself demonstrates, it is submitted, that salient facts were withheld from the issuing Court.  At a minimum the omission of such facts requires a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed 2d 667, particularly considering that as to the third wiretap order, search warrants had

already been issued but not served, completely contrary to what the affiant's statement to Judge Dimitrouleas in his application asserts.

A Court should review the affidavit to determine whether, as indicated herein above, a *Franks* hearing is mandated. Defendant George has to this point clearly demonstrated consistent with *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) that the affidavit contained material omissions and what has to be a deliberate misrepresentation as to the search warrants. Thus, at the pleadings state, it is merely required for defense to make a substantial showing that supports a finding of intent or recklessness. Given Agent Burt's key role in the investigation it may be concluded that he knew, or should have known, that valuable material of relevant nature was omitted from his affidavit. Thus, if not dismissed outright, a Franks hearing, at a minimum, should be had.

### NECESSITY WAS NOT DEMONSTRATED IN THE AFFIDAVITS

The evidence presented within the four corners of the wiretap application can be used to evaluate necessity. 18 U.C.C. § (3) ( c ). To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative technique by proving necessity. *Blackmon, supra*. Together, 18 U.S.C. § 2518 (1) ( c ) and (3) ( c ), comprise the necessity requirement for wiretap orders. Accordingly, the government may establish necessity for a wiretap by any of these alternative methods. The government may show that traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. See *United States v. Smith*, 31 F3d 1294, 1298 n.2 (4th Cir. 1994).

This Circuit as well as others have interpreted these necessity provisions to require, as indicated herein above, a full and complete statement of specific

allegations establishing necessity.  The Courts, when reviewing necessity, take a commonsense approach to evaluate the governments presumed good faith efforts to use traditional investigative techniques and tactics or its decision to forego such tactics based on the unlikelihood of their success or inherent danger.  *United States v. Commito*, 918 F2d 95, 98 (9th Cir. 1990); *United States v. Gonzalez, Inc.*, 412 F3d 1102 (9th Cir. 2005), *United States v. Ippolito*, 774 F2d 1482 (9th Cir. 1985).

This is a case in which traditional investigative techniques were in fact already in place and already working greater than any the undersigned has seen as the Defendant and others were licensed and operating with the law. Despite the boilerplate pronouncements of the Burt affidavit, at least three cooperating witnesses and several undercover agents had inserted themselves into the middle of the targeted conspiracy and were dealing with and recording several of the most significant target subjects [compare paragraph 74 of the initial wiretap, paragraph 58 of the 28 December wiretap and paragraph 100 of the 2 March wiretap applications]:

> Based on my knowledge of the facts of this investigation, my experience, and upon information contained in this affidavit, I believe that the interception of wire communications of the target subjects and others yet unknown, over the Target Telephone is the only available investigative technique which has a reasonable likelihood of revealing and of securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, to include determining the identity of all the members of the organization, transportation routes, and locations used to conceal narcotics and narcotics proceeds, and the assets purchased from the proceeds derived from the sale of narcotics.  [From paragraph 74, initial wiretap].

Again, this is a notation from every "drug" wiretap affidavit the undersigned has seen in thirty seven years.  This is a licensed pain clinic investigation, there are

no "transportation routes" or locations concealing narcotics, nor were there every any. While there are variances, these rote recitations do not meet the criteria for so intrusive a technique as a wiretap.

The Defendant recognizes that the case law suggests that the government is generally entitled to a little flexibility in investigative methods when targeting conspiratorial conduct. *United States v. McGuire*, 307 F.3d 1192 (9th Cir. 2002). Thus, a review of the requisite necessity allegations follows.

<u>SEARCH WARRANTS ARREST WARRANTS,</u>
<u>AND OTHER TECHNIQUES</u>

As indicated herein above the government takes the position that the use of search warrants and arrest warrants are more normally the last steps in an investigation. The conclusion is based on the agents assertion that this premature use of arrest and search warrants would "tip" that investigation allowing potential targets to flee.

The Ninth Circuit Court of Appeal clearly enunciated the position that the requirement of requisite necessity is no mere technicality which may be overlooked for expedience. As was held in *United States v. Martinez*, 588 F.2d 1227 (9th Cir. 1978):

> This necessity requirement exists to limit the use of wiretaps because of their highly intrusive nature and to assure that wiretapping is not resorting to in situations where traditional investigative techniques would suffice to expose the crime . . . They are not to be used routinely as the first step in criminal investigations . . . This necessity requirement is also to be interpreted in a practical and common-sense fashion.

It is interesting therefore, in light of *Martinez* to contrast the affidavits in this

matter with the affidavits scrutinized by the Ninth Circuit in *United States v. Kerrogan*, 514 F.2d 35 (9th Cir. 1975). In *Kerrogan*, the affidavit notes that one of failures of other investigative methods was the unwillingness of the informants to testify and the insufficiency of the remaining evidence to obtain convictions. See also *United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1976).

*Kerrogan* and *Kalustian* are thus factually distinguishable from the instant where the Government has already a successful investigation in place including several confidential informants, undercover operatives, bank information, undercover tapes and videos and other physical surveillance.

Even where the affidavit discusses methods used, it fails to discuss other methods to augment the normal uses. In the affidavit the Government relies merely on boiler plate statements regarding the ineffectiveness of normal techniques without detailing them, yet the agents admit to possessing probable cause, which perforce could have led to search warrants being issued. It is true as indicated above, of course, that neither pen registers nor trap tracers identify the actual participants to a call, or the subjects being discussed. But this is the case in every investigation in which they are utilized, and does not justify resorting to a wiretap.

The Government's activities in this case simply cannot overcome " . . . the statutory presumption against granting a wiretap application by showing necessity." *Giordano, supra*. Necessity must be shown by the Government before it can resort to electronic surveillance and the extent to which this multi-state, multi-jurisdictional task force obtained success obviated any had for elective surveillance. Unless other methods are not practicable, electronic surveillance cannot be justified. *Moody, supra*. *United States v. Tortorello*, 480 F.2d 764 (2nd Cir. 1973). Indeed, if the Government can justify its obtaining an intercept order in this instance, then it could

literally obtain an intercept order in every case in which the application was phrased in proper form and for any reason. The investigation could have very successfully proceeded without any wiretaps and reached the exact status it employs at this juncture. That is why the Defendant, Christopher George, urges this Court to analyze the substance of the applications, the supporting affidavits, and orders, rather than concentrating on whether or not they pass a test for form. As the United States Supreme Court stated in *Giordano, supra*, 416 U.S. 515, 94 S.Ct. 1826, 40 L.Ed.2d 341:

> Congress evinced the clear intent to make doubly sure that the statutory authority be used with restraint . . . These (wiretap) procedures were not to be retained and employed as the initial step in a criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed and it reasonably appears unlikely to succeed if tried.

Note, the requirement is two-fold. First, one must have tried normal techniques. Second, the normal techniques must have failed which did not occur at bench. As the *Ippolito*, *supra* decision states (at 1486):

> We would flout the statutory intent that wiretaps be used only if necessary, whether the sanction of the wiretap simply, because the Government had pursued some strategies that were unproductive, and more fruitful methods were available. In effect, the Government would be able to secure a wiretap in every case even when a normal strategy would be likely to be achieved with the same result without resort to the serious intrusion a wiretap necessarily entails.

The dangers envisioned by the Court in *Ippolito* would be even more pronounced if the Court sanctioned wiretaps in such cases such as the instant case

where normal investigative techniques were highly successful.  One can travel outside this circuit to find other similar sentiments expressed and similar fears raised by other Courts.  In *United States v. Lilla*, 699 F.2d 99 (2nd Cir. 1980), for example, the Second Circuit ruled that a District Court Judge had improvidently authorized a wiretap in a situation where the officer obtaining the order had failed to exhaust other procedures available to it before resorting to the wiretap.

The primary difference between *Lilla* and the instant case is the difference in the level of sophistication of the officers requesting the wiretap authorization in each case.  The officer in *Lilla* admitted that he had not tried other methods, merely suggesting that all of them were unsuitable.  In the instant case, Agent Burt was much more aware of the controlling case law.  But the underlying flaw in the *Lilla* case is the same as in the instant case, the result of the similar deficiency.  In *Lilla*, the police tried nothing.  In the case at bar, the affiant's desire to "wiretap" a good case into a better one, caused him to err on the side of over zealousness rather than continue with the obviously successful traditional investigation.

The Court noted a series of cases in the Second Circuit wherein, although interception had been upheld, they have been justifiable because of real difficulties which brought investigations being conducted by less intrusive measures to a dead end.

In *United States v. Henten*, 543 F.2d 1002 (2nd Cir. 1976), for example, an investigation into a relatively small scale drug conspiracy brought the investigators to a much larger drug ring in which one of the subjects was involved.  The inability of the police to penetrate this larger conspiracy justified the authorization of a wiretap.  Note that, once again, that the movement of the investigation was upward as well as downward.  Note, further, the leaders of the so-called conspiracy had

already been identified.  At bench, from day one Christopher George and tangentially Jeff George and all of the target subjects were known and all were or could have been interacted with by the police.  And, the ability to cause Baumhoff to become an operative was never attempted despite the mounds of evidence against him for his personally expressed desire to engage in criminal activity apart from the pain clinic employment.

The *Lilla* case details other situations involving New York State in which wiretapping was upheld.  None of the situations involved in those investigations have met with success as such success as the agents were enjoying in the instant case. *Lilla*, however, is particularly analogous to the instant case, where the Court notes (699 F.2d 104):

> The record in this case does not support the conclusion that other investigative techniques are either unlikely to succeed or were to dangerous to use.  If anything, the record establishes the contrary proposition: the normal investigative procedures that were used were successful.

The Court thus noted with scorn the contention of the Government that the identities of the individuals in the far-flung conspiracy could only be discovered through the use of wiretapping.  In the instant case as in *Lilla*, normal investigative techniques were having incredible success.  Rather then proceed with an investigation or with what they have, the agents threw up their hands, in essence, and went shopping for a wiretap.  The agents were able to have various agents again admittance to the clinic as patients, have confidential sources connected with the Defendant, including one who was working as a private investigator for the Defendant at various times.  Another was his childhood friend.  Numerous other undercovers, former

patients, other doctors and a host of investigative techniques were available.

It is not enough for the Government agents to baldly assert that normal investigative techniques are unlikely to succeed for some unspecified reason, or that they might be difficult.  The assertions must be supported by specific facts showing that more conventional and less constitutionally intrusive techniques have either been tried unsuccessfully, or concrete reasons given why they would probably fail if attempted.  *United States v. Spagnuolo*, 549 F.2d 705 (9th Cir. 1977); see also *United States v. Brown*, 761 F.2d 1272 (9th Cir. 1975).  The Ninth Circuit which has extensive litigation on the issue of necessity is particularly instructive.  The Ninth Circuit  attempted in *Spagnuolo* to reconcile previous and somewhat difficult lines of decisions stemming from *United States v. Kalustian, supra*, which suppresses the fruits of a wiretap on the ground that the affidavit lacks specificity as to why other investigative techniques could not be utilized successfully, see also *United States v. Kerrogan, supra*, which upheld the authorization.  The Court stated (at 710):

> To show that other investigative procedures have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and those efforts have failed to achieve therein.  The good faith effort need not have exhausted all possible uses of ordinary techniques.   What is required as a showing that in a particular investigation normal investigative employing a normal amount of resources have failed to make the case within a reasonable period of time.

While experienced agents may, at the outset of an investigation, be capable of anticipating whether ordinary techniques may fail or may be too dangerous, Congress has mandated that the particularized showing described herein be made as a prerequisite to the issuance of wiretap authorizations.  The Government has failed to

make a sufficient showing in the instant case that the facts of this case have justified the use of wiretaps.  In the instant case this Court must find that the normal investigative techniques being tried were successful and continuing to succeed and that there was no requisite necessity for the issuance of a wiretap order.

## DEFENDANT IS ENTITLED TO A FRANKS HEARING ON THE ISSUES RAISED

Defendant George specifically, as he did in regards to the Motion to Suppress the Search Warrant, requests a *Franks* hearing with regard to the willful and/or reckless omissions of material fact in the Government's averments of requisite necessity in the agent affidavits.  Defendant has delineated numerous factual matters justifying such a hearing.

Under *Franks v. Delaware*, *supra* a Defendant must meet certain requirements in order to obtain an evidentiary hearing on false statements and/or omissions.  The certain requirements are as follows:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any

nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue. [Footnotes omitted].

In this case, Defendant George has clearly and unequivocally met his burden. The omissions referred to above are set forth. Also depicted are the misstatements contained in the Burt affidavits that are discussed above.

Defendant George also contends that at a minimum the statements in Agent Burt's affidavit were recklessly made. The issue of search warrants in the March 2, 2010 application establish and confirm that fact. It can also be argued that the decision not to include numerous available confidential sources was willful. Certainly an agent such as Agent Burt should have known about the impact additional available confidential sources or further use of undercovers, or the actual underlying facts set out regarding these informants or sources would have had on the requisite necessity for the intercept. Additional confidential sources or undercover patients ensconced in the George pain clinic organization would have not only provided valuable intelligence but geometrically increased the ability to place more undercover agents in the midst of what of whatever was occurring.

A detailed offer of proof is made in this case by virtue of the Governments own submission of the numerous items of discovery. This submission documents the additional sources available to the Government at the time of the affidavit. An evidentiary hearing under *Franks* will further document these matters.

One thing being challenged is the veracity of the affiant, particularly when the search warrant issue of the 2 March application is considered, but, of course the Defendant has questioned a number of the statements made by the confidential sources as set out in the Burt affidavits and the least the omission of crucial facts.

Finally, as has been argued heretofore, these misstatements and omissions clearly impacted on the determinations of requisite necessity and probable cause. Thus having met the announced test of *Franks, supra* an evidentiary hearing is warranted. See *United States v. Perdono*, 800 F.2d 916 (9th Cir. 1986); *United States v. DiCesare*, 765 F.2d 890 (9th Cir. 1985).

Where, as here, when a Defendant makes a substantial preliminary showing a Court must hold a hearing to determine if the false deliberate or reckless statements made in the affidavit were material to the Court's finding of probable cause or necessity. *United States v. Fowlie*, 24 F.3d 1059 (9th Cir. 1994); *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985).

In this case, Defendant has demonstrated that the omission by the affiant of numerous material facts was intended to and did in fact mislead the Court which issued the wiretap authorization. *United States v. Motz*, 936 F.2d 1021 (9th Cir. 1991). The Court if it is persuaded that the allegations are correct is then required to take palliative steps including recasting the affidavit for a de novo determination of probable cause and requisite necessity. *Ippolito, supra*. This is the process mandated in this case.

## **FAILURE TO MINIMIZE**

As the Defendant has pointed out the agents failed to minimize numerous personal conversations of the Defendant. The Eleventh Circuit, in the matter of *United States v. Gonzalez Perez*, 283 Fed.Appx. 716 (11th Cir. 2008) recently

observed:

> Under the statute, "[e]very order and extension thereof shall ... be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5). The Supreme Court in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), set forth the standards for reviewing challenges to the government's minimization efforts: courts must make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. *Id.* at 136, 98 S.Ct. 1717. The Court counseled that "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Id.* at 140, 98 S.Ct. 1717. The standard to be applied to the government's actions is one of reasonableness. *See United States v. Van Horn,* 789 F.2d 1492, 1501 (11th Cir.1986).

The agents in the instant case listened to numerous personal conversations, again, including those regarding breast and buttock augmentations and the remainder of the personal matters, some of which were five minutes to fifteen minutes.  The Court addressed in some measure minimization in *United States v. De La Cruz Sanchez*, 601 F.3d 1202 (11th Cir. 2010), wherein at an evidentiary hearing the agent testifying defined minimization as "the act of stopping to hear the audio content of a call based on the fact there is a privileged call either between a lawyer, a priest, personal relative, something of a nonlegal nature".  This certainly was not what occurred at bench.  The minimization procedures by the Government, were, it is submitted, unreasonable, and the Court should, therefore, hold a hearing on this issue.

## CONCLUSION

Based on the facts, laws and reasons set forth hereinabove, Defendant Christopher George prays this Court grant the relief requested herein and any other relief that this Court deems just and proper.

WHEREFORE the Defendant would request that this Motion be granted.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 14th day of March, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record listed in the Service List below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## SERVICE LIST

Lawrence D. LaVecchio, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33301

Paul Schwartz, Esq.
Office of the United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33301

FRED HADDAD, P.A.
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394
Tel:   [954] 467-6767
Fax:   [954] 467-3599

By:___*/Fred Haddad_____
    FRED HADDAD
    Florida Bar No. 180891
    Email:Dee@FredHaddadLaw.com