UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80149-CR-MARRA (s)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CHRISTOPHER PAUL GEORGE,

        Defendant.
_____/

## PLEA AGREEMENT

The United States of America and CHRISTOPHER PAUL GEORGE (hereinafter referred to as "the defendant") enter into the following agreement:

1.    The defendant agrees to plead guilty to Count 1 of the Superseding Indictment, which charges the defendant with Racketeering Conspiracy, in violation of Title 18, United States Code, Section 1962(d). The United States agrees to dismiss the remaining counts of the Superseding Indictment as to this defendant after sentencing.

2.    The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "the Sentencing Guidelines") in an advisory capacity. The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable advisory guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the applicable advisory guideline range and impose a sentence that is either more severe or less severe than the advisory

guidelines range. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to twenty years for the offense set forth in Count 1, followed by a term of up to three years of supervised release. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.00.

4. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100.00 will be imposed on the defendant, which will be paid by the defendant at the time of imposition of sentence.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraphs 2, 3 and 4 of this agreement, forfeiture may be imposed as part of that sentence. The defendant agrees to the forfeiture of all of his right, title and interest to all assets listed in the Superseding Indictment, and/or their substitutes (hereinafter "the assets"), whether controlled individually or through defendant's wholly owned or partially owned corporations/companies or third-parties, which are subject to forfeiture pursuant to Title 18, United States Code, Sections 1963, 982(a)(1), 981(a)(1)(C) and/or Title 21, United States Code, Section 853. The defendant also agrees to assist the United States in achieving forfeiture of the assets and agrees to assist the United States with forfeiture of same, such assistance to include truthful testimony, especially to the extent that the assets are in the names of corporations or other entities or individuals. The defendant knowingly and

voluntarily waives any right to a jury trial or any other adversarial proceeding regarding the assets and waives any notification about forfeiture proceedings, whether administrative or judicial. The defendant further waives any statute of limitations with respect to the commencement of such forfeiture proceedings, whether administrative or judicial. The defendant also waives any defenses to the forfeiture, including any claim of excessive fine or penalty under the Eighth Amendment. The defendant also agrees to waive any appeal of the forfeiture. The defendant further acknowledges that the property forfeited cannot, either in whole or in part, be used to satisfy any obligation the defendant may have for any federal, state or local taxes, interest and/or other penalties which may now exist or which may come into existence.

6. The Office of the United States Attorney for the Southern District of Florida (hereinafter "this Office") reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. The United States agrees that it will recommend at sentencing that the Court reduce by three levels the advisory sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. However, the United States will not be required to make this sentencing recommendation if the defendant: (1) fails or refuses to make full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is

3

found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense or making false statements or misrepresentations to any governmental entity or official. In the event the applicable advisory guideline level calculation exceeds the statutory maximum, the United States will not oppose defendant's request that the Court reduce the defendant's advisory guideline range by three levels from the statutory maximum sentence in consideration for the defendant's timely acceptance of responsibility.

8. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

9. The defendant agrees that he shall cooperate fully with this Office by: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other Court proceeding; and (b) appearing at such grand jury proceedings, hearings, trials, and other judicial

proceedings, and at meetings, as may be required by this Office. In addition, the defendant agrees that he will not protect any person or entity through false information or omission, that he will not falsely implicate any person or entity, and that he that he will not commit any further crimes.

10. This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make that cooperation, or lack thereof, known to the Court at the time of sentencing. If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the advisory sentencing range calculated under the Sentencing Guidelines and/or any applicable minimum mandatory sentence, this Office may make a motion prior to sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines and/or Title 18, United States Code, Section 3553(e), or subsequent to sentencing pursuant to Rule 35 of the Federal Rules of Criminal Procedure, informing the Court that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced. The defendant understands and agrees, however, that nothing in this agreement requires this Office to file any such motions, and that this Office's assessment of the quality and significance of the defendant's cooperation shall be binding as it relates to the appropriateness of this Office's filing or non-filing of a motion to reduce sentence.

11. The defendant understands and acknowledges that the Court is under no obligation to grant a motion for reduction of sentence filed by the government. In addition, the defendant further understands and acknowledges that the Court is under no obligation of any type to reduce the defendant's sentence because of the defendant's cooperation.

12. The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, and in exchange

for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

13. The defendant further waives any right to file any motion or make any claim, whether under 28 U.S.C. §§2255, 2254, 2241, or any other provision of law, to collaterally attack his conviction, his sentence, or the manner in which sentence was imposed, unless the sentence exceeds the maximum permitted by statute.

14. The defendant confirms that he is guilty of the offenses to which he is pleading guilty; that his decision to plead guilty is the decision that he has made; and that nobody has forced, threatened, or coerced him into pleading guilty. The defendant affirms that he has discussed the matter of pleading guilty in the above-referenced cases thoroughly with his attorney. The defendant further affirms that his discussions with his attorney have included discussion of possible defenses that he may raise if the case were to go to trial, as well as possible issues and arguments that he may raise at sentencing. The

defendant additionally affirms that he is satisfied with the representation provided by his attorney. The defendant accordingly affirms that he is entering into this agreement knowingly, voluntarily, and intelligently, and with the benefit of full, complete, and effective assistance by his attorney. The defendant accordingly agrees that by entering into this agreement he waives any right to file any motion or make any claim, whether under 28 U.S.C.§§2255, 2254, 2241, or any other provision of law, that contests the effectiveness of counsel's representation up to the time of the entry of his guilty plea.

15. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 10/31/11

_____
PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

Date: 10/31/11

_____
STRIDER DICKSON
ASSISTANT UNITED STATES ATTORNEY

Date: 10/31/11

_____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY

Date: 10/31/11

_____
FRED HADDAD
ATTORNEY FOR DEFENDANT

Date: 10/31/11

_____
CHRISTOPHER PAUL GEORGE
DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80149-CR-MARRA/HOPKINS(s)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CHRISTOPHER PAUL GEORGE,

    Defendant.

_____/

## STIPULATED STATEMENT OF FACTS

The United States of America and CHRISTOPHER PAUL GEORGE enter into the following stipulated statement of facts in support of the defendant's plea of guilty:

Had this case proceeded to trial, the government would have proven that the defendant conspired to participate in criminal activities with a group of individuals and entities associated in fact as a criminal enterprise, the activities of which affected interstate commerce. The criminal enterprise engaged in a pattern of racketeering activity.

The government would have established through testimony provided by coconspirators, Court authorized wire interceptions and documentary evidence that the defendant initiated, organized, supervised and managed the criminal enterprise. The evidence would establish that in or about 2007, co-defendant Jeffrey George was introduced to a corrupt physician who worked at a pain management clinic owned by a coconspirator. Jeffrey George was aware that the coconspirator was himself, a drug abuser. The corrupt physician advised Jeffrey George that he (George) could make large sums of money by opening his own pain clinic. Jeffrey George contacted his brother CHRISTOPHER PAUL GEORGE and discussed the opening of a pain clinic. In or about 2008, Jeffrey and CHRISTOPHER PAUL

GEORGE financed the establishment of South Florida Pain. They initially employed the corrupt physician in the clinic. Thereafter, CHRISTOPHER PAUL GEORGE and Jeffrey George had a dispute over money and Jeffrey George opened a separate pain clinic in Palm Beach County. CHRISTOPHER PAUL GEORGE solicited physicians through advertisements placed on Craig's list. The corrupt physician introduced CHRISTOPHER PAUL GEORGE to pharmaceutical wholesalers. CHRISTOPHER PAUL GEORGE initially used the corrupt physician's DEA number to order controlled substances. Based upon the advice of the corrupt physician, CHRISTOPHER PAUL GEORGE decided that the clinic would only accept cash and credit cards and not allow insurance plans. CHRISTOPHER PAUL GEORGE discussed the preparation of medical forms and patient files with coconspirators. He advertised the clinic in local newspapers. The pain clinic slowly began to attract patients. He employed additional corrupt physicians in the clinic. Based upon further advice received from corrupt physicians and other pain clinic owners, CHRISTOPHER PAUL GEORGE discussed with the coconspirator physicians the prescribing of the following: 180-240 oxycodone 30 mg., 90-120 oxycodone 15 mg., and 30-50 2 mg. Alprazolam (Xanax). CHRISTOPHER PAUL GEORGE understood that the patients demanded prescriptions in those quantities or they would frequent competing pain clinics. He further understood that patients would travel from Tennessee, Kentucky, Ohio and West Virginia and other states in order to visit pain clinics in Florida. Eventually, approximately 80-90% of patients visiting CHRISTOPHER PAUL GEORGE's clinics came from outside the State of Florida.

CHRISTOPHER PAUL GEORGE closed South Florida Pain and opened American Pain in Broward and Palm Beach counties. He also opened Executive Pain in Palm Beach County. CHRISTOPHER PAUL GEORGE is a convicted felon based upon a conviction for steroid distribution and therefore placed the ownership of the clinics in nominee names. He solicited a friend, co-defendant Ethan Baumhoff, to be the nominee owner of American Pain. CHRISTOPHER PAUL GEORGE also

opened two pharmacies, Boca Drugs and Quick Pharm. He placed the pharmacies under nominee ownership. His friend, co-defendant Andrew Harrington, was the nominee owner of Boca Drugs and co-defendant Daryl Stewart was the nominee owner of Quick Pharm. In or about 2010, CHRISTOPHER PAUL GEORGE moved American Pain to a location in Lake Worth. The new location was a 20,000 square foot facility, one of the largest in the United States.

American Pain employed five physicians at one time, and also hired part-time physicians. Executive Pain employed three physicians. In American Pain, in excess of 500 patients per day were examined by the coconspirator physicians. Both American and Executive Pain were staffed by friends and associates of CHRISTOPHER PAUL GEORGE. Co-defendant Derik Nolan was the head of security at American Pain and was responsible for maintaining order among the patients. Witnesses will testify that the typical patient was approximately thirty years old and appeared to be a drug addict. The patients would present with a MRI report or would be referred to a mobile MRI facility located in the parking lot of an adult entertainment business and elsewhere. The patients, very often, traveled with family and friends from Tennessee, Kentucky and Ohio carrying large sums of cash. Virtually all the MRI's were related to alleged neck or back injuries. The patients would often pay bribes to the clinic staff in order to expedite their exams with the physicians. The coconspirator physicians conducted brief, cursory exams in order to insulate themselves and to make it appear to be legitimate medical offices. The coconspirator physicians were paid on a per-patient basis and therefore had the incentive to see as many patients as possible. The coconspirator physicians were paid both by check and in cash. The coconspirator physicians primarily prescribed the largest amounts of oxycodone (180-240 per month) in order to satisfy the patients. The wire interception establishes that CHRISTOPHER PAUL GEORGE and coconspirators discussed the amounts of pills prescribed by the coconspirator physicians and the necessity to satisfy the patients' demands. Such activity is contrary to the requirement for a legitimate

medical purpose and violates the usual and customary standard of care. The coconspirator physicians did not obtain prior medical records, or prescribe any alternative treatment modalities. Further, they did not make referrals to specialists. Virtually everyone examined by the coconspirator physicians received a prescription for controlled substances. There was no individualization of treatment as required under applicable federal and Florida law.

Records obtained in the search of American Pain establish that approximately 6,155,020 units of oxycodone were ordered by physicians employed by South Florida and American Pain. Witnesses will testify that the oxycodone pills maintained at the clinics were then dispensed from the inventories to individuals seeking such medication. Witnesses will testify that approximately sixty percent of the prescriptions issued by American Pain physicians were filled at other pharmacies. The evidence would establish that approximately 18 million units of oxycodone were prescribed from American Pain. The coconspirator physicians in American Pain ranked within the nine purchasers of oxycodone in the nation for highest dispensing physicians in the nation in 2009. The co-defendant physicians in Executive Pain ranked in the top 60 in the nation. The court authorized wire interceptions establish that, CHRISTOPHER PAUL GEORGE has informed coconspirators that his clinics have generated approximately forty million dollars in proceeds.

Executive Pain was established by defendant CHRISTOPHER PAUL GEORGE primarily to receive those individuals who had been discharged from AMERICAN PAIN due to intravenous drug use, abuse of medications and other reasons. Executive Pain employed three full time doctors and several part time doctors. The evidence will establish that Executive Pain existed solely to dispense and distribute oxycodone pills without a legitimate medical purpose.

The defendant clinics (American and Executive) dispensed controlled substances in-house. Several of the individuals who dispensed the pills had usually no medical training or experience. In

American Pain, the pills were dispensed by among other persons, an individual who was otherwise employed as a bikini model. Defendant CHRISTOPHER PAUL GEORGE and coconspirators ordered controlled substances through the use of the coconspirator physicians' DEA registration numbers. The physicians were paid extra money ($1,000-$2,000 per week) in order to maintain inventories of drugs at the clinics.

Witnesses will testify that in both American and Executive Pain, out of state patients would attempt to conceal containers filled with urine which they would carry into the clinic bathrooms in order to satisfy the urinalysis test. The bathrooms were cleaned on a daily basis and the urine containers were discovered. This activity was known to all the clinic employees including the coconspirator physicians.

The evidence establishes that pills from the coconspirator physicians pill inventories maintained at the defendants' clinics were transferred between physicians as needed, without the documentation required by the DEA. The evidence will further establish that initially the coconspirator physicians failed to inspect their pill inventories, as required by Federal law. Co-defendant Ethan Baumhoff, the manager of American Pain clinic would testify that quantities of pills were repeatedly missing from the inventories maintained at the clinics.

The wire interceptions establish that CHRISTOPHER PAUL GEORGE instructed co-defendant Andrew Harrington to lie to DEA inspectors regarding the operation of Boca Drugs. The wire interceptions further establish that the coconspirator physicians made materially false statements on forms which were mailed to pharmaceutical wholesalers. Such misrepresentations included the percentage of patients from out of state and the percentage of prescribed medication which were controlled substances.

Coconspirator testimony will establish that the motive in establishing the pain clinics was to make as much money as possible. They would testify that CHRISTOPHER PAUL GEORGE

understood that the more pills that were prescribed by the physicians, the more money he would make. The coconspirators would testify that CHRISTOPHER PAUL GEORGE urged his physicians to "keep the patient's happy" by prescribing the amount of oxycodone that they requested. Coconspirators will testify that CHRISTOPHER PAUL GEORGE informed the physicians that if the patients did not receive the quantity of oxycodone they desired, the patients would go to competing clinics. Coconspirators will explain that CHRISTOPHER PAUL GEORGE interviewed physicians and hired them based upon their willingness to prescribe large quantities of drugs. The testimony will establish that their was no legitimate medical purpose in prescribing the quantities of oxycodone.

In sum, the evidence would establish that CHRISTOPHER PAUL GEORGE and his co-defendant clinics were not legitimate medical facilities, but rather a criminal enterprise which had a goal to generate criminal proceeds through the unlawful distribution and dispensing of controlled substances without a legitimate medical purpose, and outside the usual and customary standard of care.

Defendant CHRISTOPHER PAUL GEORGE also participated in non-medically related criminal conduct. CHRISTOPHER PAUL GEORGE financed a time-share resale business operated by co-defendant Christopher Hutson. The coconspirators obtained customer lists through corrupt brokers and hired sales people who had previous telemarketing fraud experience. The telemarketers would make naturally false misrepresentations to customers in order to induce the customers to pay a marketing and sales fee. The customers believed that the business was advertising and selling their time shares when in truth and in fact no such activity was being conducted. The fraudulent business grossed millions of dollars in criminal proceeds.

CHRISTOPHER PAUL GEORGE, Jeffrey George, Derik Nolan and Gino Marquez unlawfully restrained and assaulted an individual who was suspected of stealing money from coconspirators. The victim, Robby Eddy was a friend of the GEORGE brothers. At Jeffrey George's residence Eddy was

handcuffed by Derik Nolan. Jeffrey George fired a weapon at the floor near Eddy's head in order to scare him into admitting the theft. Eddy denied taking the money and was later released.

The above-described activities were committed in the Southern District of Florida and affected interstate commerce through the acquisition of controlled substances from manufacturers located outside of Florida and the solicitation of individuals from other states.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 10/4/11

_____
PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

Date: 6/31/11

_____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY

Date: 10/31/11

_____
STRIDER DICKSON
ASSISTANT UNITED STATES ATTORNEY

Date: 10/31/11

_____
FRED HADDAD
ATTORNEY FOR DEFENDANT

Date: 10/31/11

_____
CHRISTOPHER PAUL GEORGE
DEFENDANT